UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
DENNIS STOLPNER, M.D.,                  :
                                        :
                    Plaintiff,          :      Civil Action No. 16-cv-00997
                                        :
         -against-                      :
                                        :
NEW YORK UNIVERSITY                     :
LUTHERAN MEDICAL CENTER,                :
                                        :
                    Defendant.          :
-----------------------------------------------------------X

Plaintiff Dr. Dennis Stolpner, M.D. ("Plaintiff" or "Dr. Stolpner"), by his attorneys, Beranbaum Menken LLP, complaining of Defendant New York University Lutheran Medical Center ("Defendant" or "LMC"), alleges:

## I. NATURE OF ACTION

1.      This action is brought to remedy claims of discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA"), the New York State Human Rights Law, Executive Law §§ 290 *et seq.* (the "New York State Human Rights Law" or "NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin Code § 8-101 *et seq.* (the "New York City Human Rights Law" or "NYCHRL").

2.      Plaintiff seeks economic, compensatory, and punitive damages, attorneys' fees and all other appropriate relief pursuant to federal and state law.

## II. JURISDICTION AND VENUE

3. On or about August 10, 2015, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), complaining of the unlawful discriminatory acts alleged herein. A Notice of Right to Sue was issued on December 10, 2015, less than 90 days from the filing of the herein Complaint.

4. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 (federal question), 1332 (diversity) and 1343 (civil rights). This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

5. As Defendant maintains offices in and regularly does business within the Eastern District of New York, and the circumstances giving rise to this action occurred within the Eastern District of New York, venue is proper in this District pursuant to 28 U.S.C.§ 1391(b) and (c).

### III. PARTIES

6. Plaintiff Dr. Dennis Stolpner is a resident of the State of New York and, at all times relevant to this suit, was an "employee" within the meaning of the ADA, NYSHRL, and NYCHRL. Plaintiff was also, at all times relevant to this suit, regarded or perceived as a "qualified individual with a disability" by his employer, LMC, within the meaning of the ADA, NYSHRL and NYCHRL.

7. Dr. Stolpner was a medical resident in Obstetrics and Gynecology ("OB/GYN") at LMC beginning on June 30, 2013.

8. Defendant LMC is a 450-bed teaching hospital located in Brooklyn, New York. LMC functions as the hub of Luther HealthCare and has one of the busiest emergency departments in Brooklyn, treating approximately 66,000 patients per year.

9. At all times relevant to this suit, LMC was a "covered entity" within the meaning of the ADA, NYSHRL and NYCHRL.

## IV.  FACTUAL ALLEGATIONS

10. Dr. Stolpner began his employment with LMC as a second-year medical resident ("PGY-2") on June 30, 2013.

11. Prior to that, Dr. Stolpner successfully completed his first postgraduate year in OB/GYN at Long Island College Hospital ("LICH"). When LICH lost its accreditation, he and his fellow residents needed to transfer to a new residency program.

12. Dr. Stolpner applied to LMC and accepted an offer to commence his PGY-2 year there. As part of the application process, he was interviewed in person by Dr. Kevin Fitzpatrick, LMC's OB/GYN Chairman.

13. Dr. Stolpner graduated in 2004 from the University of California Berkeley where he majored in Molecular and Cell Biology. He received his Doctor of Medicine in 2010 from New York Medical College, where he graduated with Honors in Surgery.

14. Dr. Stolpner completed two research projects in the field of acute trauma and critical care, with publications in the Journal of American College of Surgeons and Journal of Surgical Research.

15. Dr. Stolpner's road to academic and professional success did not come without adversity: originally from Belarus, Dr. Stolpner and his family immigrated to the United States in 1990 after a lengthy struggle to leave the Soviet Union.

16. LMC's Obstetrics and Gynecology residency program is ordinarily comprised of 12 residents. There are three residents for each post-graduate year; the residency takes four years to complete. A first-year resident is referred to as a PGY-1, a second-year as a PGY-2, and so on.

17. Dr. Stolpner successfully completed his PGY-2 year at LMC. During that year, he also passed his final "STEP 3" and obtained his medical license in New York State. Additionally, he created a library of presentations in multiple fields of obstetrics and gynecology,

and actively participated in teaching rounds, presenting on numerous occasions for the purpose of educating his fellow residents.

18. Despite his success, Dr. Stolpner's PGY-2 year did not come without challenges. Instead of receiving a hands-on educational experience in addition to treating patients, his opportunities were often limited to seeing laboring patients in triage.

19. His surgical cases and deliveries were often taken away from him by more senior residents without explanation, thus limiting his educational opportunities.

20. Additionally, LMC has an educational program for first-year OB/GYN residents that includes simulated situations with patients, which gives these new doctors an opportunity to practice and improve upon their communication skills with patients in a purely educational setting. LICH had no such program. Dr. Stolpner was never offered an opportunity to participate in this program at any time during his residency.

21. His requests to have greater involvement in the clinic were ignored, and on a day-to-day basis he received almost no training or mentoring in patient management.

22. As he began his PGY-3 year on July 1, 2014, his responsibilities included:
- Monitoring Labor and Delivery floor patients and assigning tasks to junior residents;
- Supervising junior residents and medical students, and encouraging them to perform new tasks;
- Predicting the course of patients in normal labor, and intervening appropriately in abnormal labor scenarios;
- Directly managing high risk patients in triage, the labor floor, post-delivery and antepartum.

23. Dr. Stolpner received such inadequate training in his PGY-2 year that he practiced cautiously and defensively in his PGY-3 year. Charged with a greater responsibility to his patients without the educational support of LMC, he often deferred to and consulted with more

senior physicians before making important medical decisions. This approach both ensured that LMC's patients were receiving the best care possible and allowed Dr. Stolpner to receive some semblance of guidance from LMC's experienced physicians.

### Dr. Stolpner's First Forced Leave

24. OB/GYN residents at LMC are given an opportunity to do a rotation at Memorial Sloan Kettering Cancer Center ("MKSCC"). Without much prior notice, Dr. Stolpner was offered the opportunity to participate in this program to begin in September of 2014.

25. He received no training or guidance in advance of the rotation, which would require him to work on a set of complex cases involving gynecological related cancers with which he had limited experience.

26. Midway through his rotation, Dr. Stolpner was told by the MSKCC Program Director to take an observational clinical role during his last two weeks at the rotation because of "patient management issues." Following the allegations, Dr. Stolpner sent an email regarding what transpired at MKSCC to Dr. Kevin Fitzpatrick.

27. Dr. Fitzpatrick did not respond to Dr. Stolpner's email, or offer to help him in any way.

28. Nobody at LMC ever spoke to Dr. Stolpner about the situation at MSKCC. No remediation took place at LMC to help Dr. Stolpner with this alleged issue. He simply resumed his duties at LMC following completion of that rotation without comment, criticism or assistance.

29. To Dr. Stolpner's surprise and dismay, on October 16, 2014, he was called to a meeting with Dr. Fitzpatrick, Program Administrator Maria Pabon, and Director of Medical Education Dr. David Tompkins, who informed him that he was being placed on administrative leave. LMC ordered him to undergo a psychiatric evaluation.

30. Dr. Stolpner has no history of psychiatric problems and had never previously been recommended for a psychiatric evaluation prior to this meeting.

31. Dr. Stolpner tried to ascertain from LMC an explanation for why his superiors thought he had a psychiatric condition. He attended multiple meetings with program management and LMC's Director of Occupational Health, Dr. Steven Salvati. During these meetings, he heard critical comments made by his colleagues about him, but nothing about any performance issues or how he could improve his performance. Most disappointingly, nobody ever explained to him why LMC believed he had a psychiatric condition, or even what that condition might be.

32. Once out on leave, and after meeting with Dr. Salvati, LMC required Dr. Stolpner to obtain an independent psychiatric evaluation from its hand-picked psychiatrist, Dr. Melanie Israelovitch.

33. After conducting an evaluation, Dr. Israelovitch determined that Dr. Stolpner did not have a psychiatric problem and he should go back to work. She informed LMC that there was nothing from a psychiatric perspective impeding his return.

34. Despite the clean bill of psychiatric health, LMC continued to possess a gross misperception that Dr. Stolpner was suffering from a psychiatric disability.

35. LMC demanded that Dr. Stolpner take medical leave to meet with someone at and possibly seek treatment through the Commission for Physician's Health ("CPH"), which treats physicians with serious, diagnosable mental health conditions and substance abuse problems.

36. Dr. Stolpner complied, and was evaluated by *another* psychiatrist, Dr. David Goldbloom, and then a neuropsychologist, Dr. Chriscelyn Tussey.

37. Like Dr. Israelovitch, Drs. Goldbloom and Tussey also did not find that Dr. Stolpner was suffering from any mental health issue or psychiatric disability.

38. Accordingly, on March 13, 2015, CPH's Director, Terrence Bedient, notified LMC's Designated Institutional Officer of Professional and Academic Affairs, Jenny Kakleas, that there was no reason why Dr. Stolpner should not be reinstated to the residency program and that he was fit to return to work.

39. Five months had elapsed and nobody was able to diagnose Dr. Stolpner with a mental health-related problem. LMC's fruitless fishing expedition into Dr. Stolpner's mental health resulted in him being sidelined for five months, and deprived him of the experience and opportunities his fellow PGY-3's enjoyed.

40. Although Dr. Stolpner was forced to go on leave for a purported mental health-related issue, Dr. Fitzpatrick told the attending physicians and residents that Dr. Stolpner had been "taken off clinical duty."

### Dr. Stolpner's Return to Work

41. After being out of work and robbed of much of his PGY-3 year due to LMC's false suspicions that he suffered from a mental health disability, Dr. Stolpner—humiliated and stigmatized—returned to work.

42. Dr. Stolpner did not receive an apology from LMC or even a warm welcome back. Instead, LMC's baseless decision to mark him as psychiatrically disabled led the program's management staff and residents to treat him like a pariah.

43. The Program Director and the Associate Program Director ignored his questions and avoided Dr. Stolpner as if something was wrong with him. They refused to take the time to help and educate him.

44. Operative cases and oversight over patient care were taken away from him without justification, and when he sought explanation, he was ignored.

45. Attending physicians routinely ignored him, refusing even to say hello or give him any critical feedback.

46. Junior residents declined to follow Dr. Stolpner's instructions or provide him with information, often to the detriment of the patient.

47. For example, on May 1, 2015, a junior resident failed to inform Dr. Stolpner that there was a patient in the Emergency Department with a degenerating fibroid, with possibility for ovarian torsion (which can result in the loss of an ovary). The patient came in the morning but

Dr. Stolpner only received information regarding the patient at around 5:00 pm. The patient was seen shortly thereafter by Dr. Stolpner and an attending physician, but the patient eventually signed out against medical advice because she wanted to follow up with her own doctor at a different hospital.

48. When Dr. Stolpner reported his concerns to the Program Director, Dr. Meera Kesavan, she did nothing to improve the situation.

49. Starved for guidance and education, Dr. Stolpner repeatedly and relentlessly asked Dr. Kesevan and others for educational opportunities, feedback and answers to questions—all for the purpose of gaining the experience and knowledge necessary to provide excellent care to LMC's patients. But time and again, he was ignored.

50. Once LMC marked Dr. Stolpner as disabled, nobody at LMC tried to help him grow and progress as a physician.

51. Junior residents were assigned to the substantive cases and were getting more operating room and surgical experience than Dr. Stolpner, while he was relegated to acting as a conduit for information between attending physicians and nurses or patients.

52. Program management thwarted his research projects and even failed to timely respond to his simple request to have his residency and licensing forms filled out.

### LMC's "Investigation" and Dr. Stolpner's Termination

53. During the last week of July 2015, Dr. Stolpner was told to see the Chairman of his program, Dr. Kevin Fitzpatrick, without explanation. The meeting was also attended by Dr. Basma Faris, the acting program director, and two program administrators.

54. At the meeting, which took place on July 27, 2015, Dr. Stolpner was told that, in the "best interests of patient care and safety," he was being placed on interim restrictive status while LMC's "recent concerns" regarding his performance were "investigated." The meeting was then adjourned to July 28, 2015 for Dr. Stolpner to have an opportunity to respond to some of the allegations against him.

8

55. At the July 28 meeting—which commenced at 8:05 am, less than 24 hours after the previous meeting—Dr. Stolpner was confronted with seven separate examples of his alleged actions that raised concerns about his performance. On short notice, he attempted to respond to the allegations (without being provided the thousands of pages of medical records pertinent to the discussion).

56. This 70-minute meeting constituted Dr. Stolpner's only opportunity to explain his side of the story and defend himself prior to his termination.

57. LMC's "investigation" into these incidents was referred to the Clinical Competency Committee ("CCC"). The seven cases (two of which involved a communication issue concerning a single patient) were presented to the CCC on July 30, 2015, which then produced a report about each case.

58. LMC's "investigation" into Dr. Stolpner's performance was rife with thin, unsubstantiated allegations against Dr. Stolpner that clearly serve as a pretext for removing him from the program due to his perceived disability.

59. Dr. Stolpner's deficiencies as alleged by the CCC were nearly all related to "communications" issues—allegations of failing to communicate information to other doctors. They had nothing to do with his technical abilities or rapport with his patients. Nor did they relate in any meaningful way to the medical care of his patients.

60. Not one patient treated by Dr. Stolpner complained about the treatment and care he provided.

61. Throughout its investigation, LMC grasped at straws to blame Dr. Stolpner for its own failures large and small. For example:

- LMC accused Dr. Stolpner of improperly administering a dose of Heparin to a patient who did not require the drug. After further investigation by Dr. Faris and the CCC, LMC concluded that the drug was actually ordered by someone else

9

before Dr. Stolpner even commenced his shift. By LMC's own admission, this accusation against Dr. Stolpner was false.

- After a patient who had lost her baby during childbirth was transferred to the psychiatric ward by Dr. Stolpner, she was not seen for two days. LMC turned this into an allegation against Dr. Stolpner, who made every effort to inform the psychiatric ward staff of the patient's situation, including sending a text message to a senior resident in the ward. LMC made this allegation without any evidence of wrongdoing by Dr. Stolpner. When the case was presented at the CCC meeting on July 30, the committee took no position as to Dr. Stolpner's culpability.

- Of the seven "cases" brought against Dr. Stolpner, three were eventually not relied upon in his residency termination "due process" hearing, and none involved any adverse medical consequences to any patients.

62. The fact that LMC's own CCC acquitted Dr. Stolpner in two of the seven allegations is evidence that Dr. Stolpner's superiors targeted him because of his perceived disability, and were willing to bring specious allegations against him in an effort to remove him from the program.

63. By LMC's own admission, none of the alleged incidents resulted in an injury to a patient.

64. Dr. Fitzpatrick, the OB/GYN Chairman never even reviewed any of the medical records concerning these cases before he took part in the CCC's decision-making process.

65. Still, the CCC recommended that his residency be terminated.

66. On August 10, 2015, Dr. Stolpner received a letter from Dr. Fitzpatrick stating that his employment with LMC was terminated.

67. Dr. Stolpner challenged the termination by exercising his right to what LMC calls a "Due Process Hearing" at LMC, which took place on February 1, 2016.

68.     This "Due Process Hearing" did not provide Dr. Stolpner with any due process whatsoever. The hearing procedures were flagrantly biased against Dr. Stolpner and in favor of LMC.

69.     For example, the "Committee" of five people charged with deciding whether the termination was reasonable consisted exclusively of LMC doctors. Dr. Stolpner's request for objective, impartial fact-finders was denied.

70.     The hearing Chair, also an LMC doctor, had prior knowledge of Dr. Stolpner's alleged employment issues at LMC.

71.     The Chair, who functioned as a judge would in a trial, entertained various applications from both sides. Dr. Stolpner's request that the Chair obtain outside counsel to give objective rulings on various issues—including the composition of LMC's hand-picked "committee" of fact-finders—was denied.

72.     LMC made no effort to resolve this obvious conflict of interest.

73.     The issue at the hearing was whether his termination was "reasonable." Dr. Stolpner had the burden to demonstrate that his termination was not reasonable.

74.     The decision to terminate Dr. Stolpner was made by Dr. Fitzpatrick, the Chair of LMC's OB/GYN department.

75.     In order for Dr. Stolpner to prevail at the hearing, a group of Dr. Fitzpatrick's colleagues, which included both his subordinates and fellow department chairs, would have to find Dr. Fitzpatrick's actions "unreasonable."

76.     Predictably, the Committee upheld the termination in a decision issued on February 26, 2016.

77.     Dr. Stolpner never received the training or coaching he sought by his superiors at LMC. He was deprived of the same educational opportunities provided to his fellow residents. His purported failure as a resident—to the extent that such a failure even existed—was

orchestrated by LMC as a pretext for its decision to terminate him based on a perceived psychiatric disability.

78. As a result of his unlawful and discriminatory termination, Dr. Stolpner's medical education has been compromised, his professional career thwarted, his reputation diminished, and he has suffered lost income.

## FIRST CAUSE OF ACTION: ADA "REGARDED AS" DISCRIMINATION

79. Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

80. LMC discriminated against Dr. Stolpner by terminating his employment because it regarded Dr. Stolpner as suffering from a mental disability and consequently unable to perform as a medical resident in LMC's residency program.

81. At all relevant times, Dr. Stolpner was qualified for the position of PGY-3 in LMC's OB/GYN Residency Program

82. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the ADA, Dr. Stolpner has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits, as well as loss of medical education and professional reputation.

83. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the ADA, Dr. Stolpner has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

84. Defendant's unlawful discriminatory actions constitute willful violations of the ADA for which Dr. Stolpner is entitled to an award of punitive damages.

## SECOND CAUSE OF ACTION: NYSHRL
## "REGARDED AS" DISCRIMINATION

85. Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

86. LMC discriminated against Dr. Stolpner by terminating his employment because it regarded Dr. Stolpner as suffering from a mental disability and consequently unable to perform as a medical resident in LMC's residency program.

87. At all relevant times, Dr. Stolpner was qualified for the position of PGY-3 in LMC's OB/GYN Residency Program

88. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the NYSHRL, Dr. Stolpner has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits, as well as loss of medical education and professional reputation.

89. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the NYSHRL, Dr. Stolpner has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

90. Defendant's unlawful discriminatory actions constitute willful violations of the NYSHRL for which Dr. Stolpner is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION: NYCHRL
## "PERCEIVED" DISCRIMINATION

91. Plaintiff repeats and realleges each and every allegation contained in this Complaint with the same force and effect as if fully set forth herein.

92. LMC discriminated against Dr. Stolpner by terminating his employment because it perceived Dr. Stolpner as suffering from a mental disability and consequently unable to perform as a medical resident in LMC's residency program.

93. At all relevant times, Dr. Stolpner was qualified for the position of PGY-3 in LMC's OB/GYN Residency Program.

94. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the NYCHRL, Dr. Stolpner has suffered and continues to suffer monetary and/or economic damages, including but not limited to loss of past and future income, compensation and benefits, as well as loss of medical education and professional reputation.

95. As a direct and proximate result of Defendant's unlawful and discriminatory conduct in violation of the NYCHRL, Dr. Stolpner has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

96. Defendant's unlawful discriminatory actions constitute willful violations of the NYCHRL for which Dr. Stolpner is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

a. Declaring the acts and practices complained of herein to be violations of the ADA, the NYSHRL, and the NYCHRL;

b. Directing Defendant to make Plaintiff whole for all earnings and other benefits he would have received but for Defendant's unlawful conduct, including but not limited to wages, bonuses, other lost benefits, loss of good will, and interest thereon;

c. Directing Defendant to pay Plaintiff front pay, to compensate him for all monetary and/or economic damages, including but not limited to the loss of past and future income, wages, compensation, seniority and other benefits of employment;

d. Directing Defendant to pay Plaintiff compensatory damages, including damages for his mental anguish, denial of life's pleasures, pain and suffering and humiliation; liquidated damages; punitive damages and interest thereon;

e. Directing Defendant to pay Plaintiff an award of punitive damages;

f. Awarding Plaintiff the costs of this action together with reasonable attorneys' fees;

g. Granting such other relief as this Court deems necessary and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff respectfully demands that this proceeding be tried to a jury.

Dated: New York, New York

February 29, 2016

Respectfully Submitted,

BERANBAUM MENKEN LLP

By: _____

Bruce E. Menken
Scott Simpson
80 Pine Street, 33rd Floor
New York, NY 10005
Ph: (212) 509-1616
Fax: (212) 509-8088