UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------X

DENNIS STOLPNER, M.D.,

                 Plaintiff,

          -against-

NEW YORK UNIVERSITY LUTHERAN
MEDICAL CENTER,

                 Defendant.

----------------------------------X

**<u>MEMORANDUM & ORDER</u>**

16-cv-997(KAM)

**MATSUMOTO, United States District Court Judge**

       Plaintiff filed the instant Complaint on February 29, 2016, alleging that his termination from the residency program at Lutheran Medical Center ("LMC") violated the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.* ("ADA"), as amended by the ADA Amendments Act of 2008 ("ADAAA"), the New York State Human Rights Law, Executive Law §§ 290 *et seq.* ("NYSHRL") and the New York City Human Rights Law, Admin. Code § 8-101 *et seq.* ("NYCHRL") because he was "regarded as" disabled.

       Defendant, LMC, filed its answer on April 1, 2016 and on February 16, 2018, moved for summary judgment. The Court has considered the parties' submissions (ECF Nos. 26-37) in support of

and in opposition to defendant's Motion for Summary Judgment. For the reasons set forth herein, the court finds that under the well-established *McDonnell Douglas* burden shifting framework, plaintiff fails to present evidence to create a triable issue of material fact or to establish a *prima facie* case of discrimination based on disability or perceived disability. Moreover, even assuming, *arguendo*, plaintiff was able to establish his *prima facie* case, defendant has met its burden of coming forward with undisputed evidence of a legitimate non-discriminatory reason for plaintiff's dismissal and plaintiff has failed to raise a genuine issue of material fact as to whether the legitimate nondiscriminatory reasons provided by LMC were pretextual. As such, the court grants defendant's motion for summary judgment and the complaint is dismissed as set forth herein.

## I. STATEMENT OF FACTS

### A. PLAINTIFF'S PGY-1 YEAR AT LICH

Based on the record before the court, the following facts are not in dispute unless otherwise noted. Plaintiff began his Obstetrics and Gynecology ("OB/GYN") residency at Long Island College Hospital ("LICH") in 2012. After LICH lost its accreditation at the end of the academic year, plaintiff applied to transfer to LMC as a second-year resident or "PGY-2." (JA(1)-010; Compl. ¶ 12.) Dr. Fitzpatrick, chairman of the OB/GYN department at LMC, interviewed plaintiff in June 2013, and LMC accepted plaintiff

2

to the program shortly thereafter.  (JA(2)-018 - JA(2)-022.)  Dr.

Fitzpatrick interviewed plaintiff for 30-60 minutes and rated him at

a four out of five for professionalism, accountability, and

resiliency, with an overall rating of a three out of five.  (JA(2)-

019 - JA(2)-021.)   After plaintiff's residency began on June 30,

2013, the LICH Program Director submitted a residency verification

form to LMC recommending plaintiff for the transfer "with

reservations," stating:

> [Dr. Stolpner] satisfactorily completed the required
> rotations for his complete PGY1 year of training 2012-
> 2013. However, cumulative evaluation scores for completed
> rotations for the year were marginal in each of the six
> competencies. If he had been able to continue in the
> residency program … at LICH, our Education Committee
> recommended continued monitored performance with a three-
> month limited opportunity to assure performance
> satisfactory at the PGY2 level.

(Def. 56.1 at ¶ 8 (citing ECF No. 29, Briton Aff., Ex. A, Def. Ex.

1)[1]; *see also* JA(2)-022.)  Plaintiff was aware that LICH recommended

continued monitoring and did not allege that the Program Director at

LICH perceived him as mentally disabled.  (JA(2)-001.)  Plaintiff's

evaluations from LICH were mixed.  Plaintiff received a largely

positive review from one supervisor who provided grades of "Pass",

"High Pass" and Honors" for plaintiff.  (*See* ECF No. 32, Menken

Decl., Ex 2.)  For his OB/GYN grade, plaintiff excelled in "history

---

[1] All references to Defendant's exhibits marked at Plaintiff's deposition taken on
August 10, 2016 and attached to the Declaration of Roger H. Briton, Esq. as Exhibit
A are hereinafter referred to as "Def. Ex.A- __." Where the "__" is the number the
exhibit was assigned at the deposition.

3

and interviewing skills, physical examination skills, knowledge, data interpretation...professionalism in patient care. (*Id.*) The reviewer also note, "[h]e received a grade of pass for the clinical component[,] . . . was always involved while on call[,] . . . improved during the rotation with increasing experience[,] . . . was easy to work with and had excellent response to feedback. (*Id.*)

However, the negative evaluations from practitioners who worked with plaintiff at LICH did not support the foregoing narrative. Plaintiff's record from his time at LICH contained negative evaluations by six different physicians who worked with plaintiff. He was perceived as having a low base of knowledge, an unwillingness to learn, and raised serious concerns about his honesty and reliability when caring for patients and documenting their conditions. (Def. 56.1 at ¶ 10.) LMC received an evaluation summary from LICH, (Def. Ex. A-2), which included the comments from physicians at LICH, among them:

- Dr. Gopika Are: "incomplete history and physical exam"; "needs improvement in all of the components"; "no initiation [sic] to prepare for lectures and thus unable to participate in didactics. Multiple attempts were made, instructions given for correct Patient Data entry and medical records etc. but no improvement. Interpersonal communication skills need to be the first in the priority of improvement, especially in patient care and safety"; "basic medical knowledge needs improvement. He has to come up with a method by which he can remember and apply whatever is taught to him because he is unable to execute simple tasks after several attempts of teaching."
- Dr. Judith Weinstock: "has 0 base of gyn knowledge.

Looked at me quizzically when I use the word anovulatory. My daughter, who is a musician, knows more basic gyn than he does"; "very sweet guy, but barely able to communicate with co-workers or patients"; "trying to improve his performance, but is so far back it is difficult to believe he will be able to catch up"; "I am not sure what this resident is doing on a gyn service"; "this resident started knowing less obgyn than any resident I have seen in 20 years. He has shown increase in medical knowledge base, but seems to lack obgyn medical sensitivity and, in general, appears lost"; "medical knowledge base has improved, but has problems applying this to clinical medicine"; "very strange affect and has problems with interpersonal relationships"; "very problematic resident. Doesn't seem to hear anything one has to say. One needs to check everything he says for accuracy and to make sure he has followed through. Can be nasty to residents who are trying to teach him"; "disorganized and disorganizing with complete lack of interpersonal skills"; "does not know how to think like an Ob Gyn. Cannot prioritize information, so a final judgment or diagnosis can be reached"; "seems incapable of applying learned info to patient care"; "nice to patients, on time to clinic, but has lied to me in reference to patients' test results if he does not know the answer. One must check everything he does"; "lacks insight into his own failures"; "this resident should not be in an ObGyn residency. He will lie, rather than say, 'I don't know' this will eventually pose a risk to patient care when his seniors are no longer checking everything he does or says".

- Dr. Byron Myers: "not spontaneously communicative"; "has indicated a series of gaps in his knowledge of the specialty"; "insensitive to patient[']s requests and needs; disrespectful to his colleagues at all levels. At times has demonstrated very irresponsible behavior"; "his knowledge in ob/gyn needs a complete overhaul"; "does not [have] much of a rapport with the other residents and other members of the medical team. He is distant and detached"; "he is not [sic] under-performing even for a new pgy-1. His personality does not help that much either. Maybe this is not his 'calling.'"

- Dr. Potacia Francis: "Dr. Stolpner appears to be completely unprepared for this Residency. He was

advised how to quickly catchup on basics of
Obstetrics and Gynecology. He demonstrates no
enthusiasm or initiative"; "always fail to include an
assessment and plan in his evaluations"; "is unsure
of himself…"; "Very low fund of knowledge that he is
aware of"; "Dr. Stolpner either is unwilling or
unable to learn and develop as a physician. He
presents patients without obtaining a complete
history, physical examination or formulating an
assessment or plan"; "requires constant supervision
and redirection"; "noted attempts at increasing his
fund of knowledge. However he has difficulty applying
it clinically"; "observed to have difficulty
communicating with his team". . . . "is respectful
and cordial, but fails to listen to suggested
approach to patient care. He doesn't seem to learn
from previous encounters ….."; "Makes very little
effort to work independently so as to provide a
complete evaluation and plan. Instead he seem[s] to
want direction at every step..

- Dr. Dawnette Lewis: "lots of room for improvement.
Does not listen to his senior residents, does not
respond to constructive criticism."

(*Id.*)  When confronted with some of the negative evaluations at

deposition, plaintiff asserted that the doctors at LICH only felt he

needed assistance with a general knowledge base.  (*See* JA(1)-004.)

Plaintiff was unable to explain the negative observations made by

Dr. Weinstock as he claimed he never encountered Dr. Weinstock

during patient care, and could not speak to whether the negative

statements from Dr. Myers and Dr. Francis were justified.  (Def.

56.1 at ¶ 11 (citing (JA(1)-006 –JA(1)-009).)  Although plaintiff

objects on relevance grounds to the critiques from LICH being

considered, he does not deny the factual accuracy of the reviews.

(ECF No. 31, Plaintiff's Opposition to Defendant's 56.1 Statement (

Pl. 56.1"), at ¶¶10-11.)

## B.    PLAINTIFF'S PGY-2 YEAR AT LMC

Plaintiff's PGY-2 year commenced at LMC on or about June 30, 2013, and extended until June 2014.  During this time, attending physicians and other hospital staff submitted pointed written critiques of plaintiff's performance as a resident.  On December 29, 2013, an LMC attending physician named Dr. Shevon Joseph emailed the Program Director at the time, Dr. Diane Tarr, stating:

> I am very concerned about the management of this patient that is directly a result of decisions made by Dr. Stolpner that were apparently not discussed with the covering attending on 12/28/13 and was not communicated to any other residents on the service and therefore the patient was inappropriately signed out . . . . The team today has expressed that Dr. Stolpner has long been in the habit of ordering these unindicated studies, labs and consults without discussing this with his team or attending.  In addition to this he fails to relay his management plan to the oncoming team.  I decline to be further involved, but I wished to bring this to your attention because the residents seem to be fully aware of this issue and claim to have brought this to your attention in the past.  A discussion must be had with Dr. Stolpner.

(Def. 56.1 at ¶ 12 (citing Def. Ex. A-7).)  Dr. Tarr thanked Dr. Joseph for her email and indicated her agreement, explaining that she, "had many conversations with [plaintiff] re: the need for attending approval of any management decisions."  (Def. Ex. A-7.)  Plaintiff testified at his deposition that he did not recall the incident referenced in the email, but believed that Dr. Joseph spoke to him about sign-outs and ordering unindicated labs and consults without discussing it with the attending physician.  (*See* JA(1)-010 – JA(1)-013.)  Plaintiff ascribed no ulterior motivation to Dr. Joseph's

7

negative critique and did not express a belief that she perceived him as disabled.  (*Id*.)

On February 14, 2014, a junior resident indicated to Dr. Tarr that plaintiff was, "NOT READY to be a senior because he's not even a competent junior yet!"  (Def. 56.1 at ¶ 13 (citing Def. Ex. A-8 at D433-434); JA(1)-014 – JA(1)-019).)   The resident also stated he was complaining because plaintiff's mismanagement was affecting patient care, stating, "He does not know how to prioritize, it takes him such a long time to see patients, [he] does unnecessary tests, [and] over-diagnoses patients." (*Id*.) Plaintiff thought this resident was "very good" but disputed the factual accuracy of the allegations, and provided no explanation beyond his conclusory statements that he could "only assume the reason . . . was to protect herself from . . . mismanaging a patient."  (Pl. 56.1 at ¶ 13 (citing JA(1)-016-017).)

On February 16, 2014, Dr. Hail Besson, an attending physician, emailed Dr. Tarr to indicate that Dr. Besson spoke to plaintiff regarding his behavior with female staff and junior residents, and warned him that future behavior of the same nature would result in an official write-up.  (Def. Ex.A-8 at D435.) Plaintiff emailed Dr. Tarr the next day stating that the complaining resident failed to follow his instructions that day and that he had discussed the issue with Dr. Besson and the resident.  (Def. 56.1 at ¶ 14 (citing Def. Ex. A at 8).)  In what appear to be Dr. Tarr's

handwritten notes on the resident's email, Dr. Tarr states in relevant part:

> All residents -- trouble following orders-- gets involved in extraneous tasks-takes a long time[;] Dr. Shahem conversation 2/13/14 – DS does not have interpersonal skill for interaction with other team members + no interaction with patients. Argues with the team in front of []-- thinks he has repetitive compulsive behaviors hence rechecking of things already done over and over -- spoke to Carmen Price ? refer for psych eval?"

(*Id*. at ¶ 15 (citing Def. Ex. A-8 at D434).) However, plaintiff claimed he had no recollection of the incident with Dr. Besson and no explanation for why Dr. Besson would make the statements she did. (JA(1)-018 – JA(1)-019.)

In opposition to the defendant's motion, Plaintiff denied both the accuracy of the notes and that they were written by Dr. Tarr. (Pl. 56.1 at ¶ 15.) The court will not consider the notes because the author is unknown.

Defendant met with Dr. Tarr and Dr. Dorcas Morgan on March 6, 2014 to discuss plaintiff's repetitive behaviors, which involved, "repeated exams on patients that either he or another resident or house physician had already examined, and once even [a] repeated . . . exam after an attending had examined the patient," which Dr. Tarr indicated in her memo to file was "distressing" given that she had met with plaintiff "at least 4 times since his starting the rotation" to discuss this issue. (Def. Ex. A-9.) Dr. Tarr also noted that plaintiff, "persisted in saying that any

9

miscommunications were not on his part, but on theirs [the team] . . . . . he was not aware of the behaviors discussed that are distressing to others." (*Id.*) Although the memo to file stated that plaintiff would be referred to Dr. Steven Salvati, an occupational health doctor, Plaintiff was not referred at that time. (JA(1)-020 – JA(1)-021.)

Plaintiff alleged in his Complaint that he had limited opportunities during his PGY-2 year and "received almost no training or mentoring in patient management," and has asserted the same in his opposition to the motion for summary judgment. (*See* Compl. ¶¶ 18-21; ECF No. 31, Plaintiff 56.1 Opposition ("Pl. 56.1,") at ¶¶ 14-22. However, despite the negative feedback plaintiff received and plaintiff's own allegations regarding his lack of training and mentorship, Dr. Fitzpatrick testified at deposition that plaintiff, "was appropriate for a PGY2," and he progressed to a PGY-3 on July 1, 2014. (JA(13)-044; Def. 56.1 at ¶22; Def. Ex. A-10, D401.)

## C.    PLAINTIFF'S PGY-3 YEAR AT LMC

In April 2014, plaintiff signed a PGY-3 Residency Agreement that listed his responsibilities as a physician in the OB/GYN department for the term July 1, 2014 to June 30, 2015. (Def. Ex. A-10 at D403.) That same month Dr. Tarr left LMC. (JA(4)-006 – JA(4)-009.) In June 2014, only a few months after plaintiff began his PGY-3 residency, two nurses reported concerns about incidents involving plaintiff's patient care. At deposition, nurse Cheryl

10

Delucia testified that plaintiff, entered a birthing room alone, conducted a sonogram on a pregnant patient, and then turned off the fetal monitor for the pregnant patient and left it off. (JA(12)-003 – JA(12)-004.) The patient was in an active stage of labor, and plaintiff, still a resident, had moved forward with a vaginal exam and potentially broke the patient's water without notifying anyone. (*Id*.) Ms. Delucia testified that due to plaintiff's actions, the situation escalated to an emergency level, and expressed her concerns that the patient should not have been removed from the fetal monitor other than for the duration needed for a sonogram. (*Id.* at 004-005.) Further, the patient's water should not have been broken without the monitor on and anyone else in attendance, as it was very high risk. (*Id*.) Ms. Delucia informed her assistant charge nurse and her care coordinator about what happened and the incident was reported to Dr. Kesavan. In a second incident, nurse Amanda (Frank) Nelson reported that plaintiff ordered medication for a patient and did not report it to the attending. (JA(11)-004 – JA(11)-008.)

In July 2014, Dr. Kesavan completed a form entitled "Departmental Academic Remediation (Initial)," discussed both of the nurses' complaints with plaintiff, and noted that she had discussed the issue of the need to communicate with chief residents, attending physicians and nursing staff on the floor with plaintiff before. (Def. Ex. A-13 at LMC 001-010). Dr. Kesavan wrote in part

11

that she, "had this conversation with Dennis on the floor before….The above situation cannot happen again . . . . Dennis agrees 100% that communication is key and if she gets another complaint or concerns she would need to write him up." (*Id.*) On July 31, 2014 plaintiff signed a copy of the Departmental Academic Remediation form. (Def. 56.1 at ¶ 21; Def. Ex. A-13 at LMC 001-005.) Defendant, however, did not implement a formal remediation plan at this time. (*See* Pl. 56.1 at ¶ 21.) When confronted with the nurses' complaints at deposition, plaintiff responded that "these may have been real complaints" but felt that they were incorrectly described and further testified that he believed Dr. Kesavan raised the complaints she did in her notes because she was concerned that he do well in the program, and that she was trying to assist him with successfully completing the program in July 2014. (JA(1)-025 – JA(1)-027.) In his 56.1 Statement, plaintiff admits that Nurse Delucia and Nurse Nelson expressed concerns about the two incidents in June, but alleges that five months later, Ms. Nelson said plaintiff "butts heads" with others "probably no more than other residents" and had been "persecuted since he got here." (*See* Pl. 56.1 at ¶ 21.) Plaintiff does not cite to any evidence in the record to support the purported statement by Ms. Nelson.

Just a few weeks after Dr. Kesavan's remediation effort, plaintiff received additional significant negative feedback. On August 2, 2014, Dr. Joseph complained that plaintiff failed to

timely transfer a hemorrhaging patient, failed to assist with a procedure, failed to show when called, and delayed transfer of a patient and instead sent a patient for a sonogram that [an attending] explicitly instructed plaintiff against. (Def. Ex. A-14 at LMC 036.) Plaintiff's response when presented with the criticism was that he believed Dr. Joseph mischaracterized what occurred. (JA(1)-028.)

Dr. Morgan, another supervising doctor, completed an "End of Rotation" evaluation for the period of July 28, 2014 to August 24, 2018 which described plaintiff's skill level as predominantly "novice" and stated, "[H]e needs help. . . . He is below his level of training in every aspect. My major concern with him is that I do not believe he is aware of how much of a deficit he functions at." (Def. Ex. A-15 at D308). Plaintiff disagreed with Dr. Morgan's evaluation and did not know why she wrote it. (JA(1)-029 – JA(1)-031; JA(1)-047.) "Yes," plaintiff testified at his deposition, "I'm a novice, but no, I do not agree that this should be my evaluation." (JA(1)-030.) When asked how the evaluation was inaccurate, plaintiff stated he would need to compare it to other residents' evaluations because he, "believed they received higher evaluations and were below [him] or on par with [his] abilities." (JA(1)-030 – JA(1)-031.) Asked at deposition about another "novice" rating from a supervising doctor at a Continuity Clinic Evaluation that explicitly stated "Dr. Stolpner needs remediation," (Def. Ex. A-16),

plaintiff's reaction echoed his repeated response that criticisms of his skills were biased or unfounded, and emphasized that his skills were "on par with other residents." (JA(1)-031 – JA(1)-032.)

Notably, when asked if the doctors who issued the negative ratings or complaints had problems with plaintiff other than what was noted by the doctors, plaintiff replied "no," and was uncertain as to whether the doctor's perception of his mental health motivated the negative ratings. (*See* JA(1)-026 – JA(1)-028, JA(1)-031 – JA(1)-032.) With regards to Dr. Joseph, who complained in August 2, 2014 about the plaintiff's failure to transfer a hemorrhaging patient and failure to assist or respond, plaintiff testified that he had no prior problem with Dr. Joseph except her speaking to him about following her instructions, and testified that he believed her perception of his mental health influenced her evaluation. (*See* JA(1)-028 - JA(1)-029.) Plaintiff acknowledged that in retrospect he personally would have wheeled the patient into the operating room. (See JA(1)- 028.) Plaintiff earlier testified that he did not believe Dr. Joseph's perception of his mental health affected her critiques of him that during his PGY-2 year that he made decisions without discussing them first with the attending, ordered unindicated studies, labs and consults, and failed to relay management plans to oncoming medical teams. (JA(1)-010 – JA(1)-013.) Plaintiff accounted for some of his errors by alleging that he received no training or guidance leading up to his rotation,

unlike other LMC residents who plaintiff believed "had more access to oncology attendings." (JA(1)-033.)

As part of the standard protocol for PGY-3s at Lutheran, plaintiff was scheduled for a one-month rotation at Memorial Sloane Kettering ("MSK") in September 2014. (See JA(1)-033.) He began the rotation in early September, however, after just two weeks, MSK relieved plaintiff of his clinical responsibilities due to "patient management issues" in what defendant described as an "unprecedented" move by MSK. (ECF No. 30, Def.'s Mem. at 9-10; Compl. ¶ 26; JA(1)-032 – JA(1)-034.) In a letter dated September 18, 2014, Dr. Yukio Sonoda, MSK's Director of Residents and Medical Students reported to Dr. Kesavan that "concerns brought up [regarding plaintiff] include mis-reporting of information and difficulty carrying out a treatment plan. Due to these concerns regarding his reliability, they feel that patient care could potentially be compromised. They do not feel his actions have been intentional, and they are willing to have him remain on their team as an observer." (Def. 56.1 at ¶ 25.) On September 17, 2014, one day before Dr. Sonoda's letter was issued, plaintiff emailed Dr. Fitzpatrick disputing Dr. Sonoda's complaints and called the MSK complaints regarding a "Do Not Resuscitate" or "DNR" issue "absolutely not true," and characterizing his own actions during the clinical rotation as "completely reasonable." (See Def. 56.1 at ¶ 26 (citing Def. Ex. A-17; Compl. ¶ 26).) After plaintiff's dismissal from his rotation at MSK, he returned to LMC, and was allowed to treat patients

for a brief period. (JA(2)-028.)  Dr. Fitzpatrick testified at

deposition that he initially felt that the new environment at MSK

might have caused some of the plaintiff's issues and that plaintiff's

return to a familiar environment would permit plaintiff to continue

his residency.  (*Id.*)  Dr. Fitzpatrick could not recall whether any

remediation plan was put in place for plaintiff or whether any special

training was implemented for plaintiff.  (*Id.*)

Additional serious accusations and negative information from

doctors followed plaintiff's return to LMC.  In a letter dated October

8, 2014, Emily Crawford, MSK's Designated Institutional Officer and

Administrator from the Office of Graduate Education asked that LMC

review the "highly unusual situation" involving plaintiff's inability

to complete his rotation at MSK "in the context of [plaintiff's]

overall performance, in order to determine if it [was] necessary to

make a report under Section 2803 of New York Public Health Law." (Def.

Ex. A-19.)  N.Y. Public Health Law § 2803 governs the rights of

patients in medical facilities.[2]  Plaintiff was aware that MSK's

---

[2] § 2803-e is the relevant provision and states, in part:
  1. (a) Hospitals and other facilities approved pursuant to this article shall
  make a report or cause a report to be made within thirty days of the
  occurrence of any of the following: the suspension, restriction, termination
  or curtailment of the training, employment, association or professional
  privileges or the denial of the certification of completion of training of an
  individual licensed pursuant to the provisions of title eight of the education
  law or of a medical resident with such facility for reasons related in any way
  to alleged mental or physical impairment, incompetence, malpractice or
  misconduct or impairment of patient safety or welfare; the voluntary or
  involuntary resignation or withdrawal of association or of privileges with
  such facility to avoid the imposition of disciplinary measures; or the receipt
  of information which indicates that any professional licensee or medical
  resident has been convicted of a crime; the denial of staff privileges to a
  physician if the reasons stated for such denial are related to alleged mental

decision to remove him from clinical duties was driven by serious

complaints by a supervisor, Dr. Carol Brown, and plaintiff testified

at deposition plaintiff that he did not believe Dr. Brown perceived

him as having anything wrong with him or perceive him as mentally

disabled. (JA(1)-032 – JA(1)-035, JA(1)-037 – JA(1)-041.)  In her

October 12, 2014 evaluation, Dr. Brown stated in relevant part:

> Dr. Stolpner seems not able to follow simple directions.
> On multiple occasions he did the opposite of what was
> asked or completely ignored instructions.  He consistently
> wrote the wrong orders in patients . . . and on one
> occasion where I had given specific instructions in a
> detailed email to the entire team not to ask a dying
> patient again about her decision re DNR [do not
> resuscitate] as she had requested to think about it
> overnight, [D]r. Stolpner went to the patient's room and
> tried to get her to decide about DNR.  The patient and her
> family were extremely distressed by his words and manner
> and I was actually shocked that a resident would disobey a
> direct order like that.  However[,] and this is [an]
> important point, Dr. Stolpner believed he was doing the
> right thing in speaking to the patient and really believed
> he was helping the situation.  For this reason and many
> other examples of his behavior over the month he spent
> with us, I believe that Dr. Stolpner may have some basic
> difficulty with processing instructions or multitasking.
> Throughout his time with us [D]r. Stolpner was pleasant
> respectful and professional in his demeanor.  However I
> would have grave concerns about him functioning
> unsupervised in any patient care situation based on the
> experiences we had with him this month.

(Def. Ex. A-20 at LMC 038.)  Like previous evaluators, Dr. Brown

complained that plaintiff had serious difficulty following directions

---

        or physical impairment, incompetence, malpractice, misconduct or impairment of
        patient safety or welfare.
N.Y. Pub. Health Law § 2803-e

in critical patient care situations and expressed concern about plaintiff's lack of awareness or concern for his deficiencies.

In light of the October 8, 2014 letter from Dr. Brown, Dr. Kesavan asked Dr. Marecheau to put her previous verbal complaints about plaintiff into writing.  (JA(4)-040 – JA(4)-042.)  On October 14, 2014, Dr. Jacqueline Marecheau, who had direct experience supervising plaintiff, submitted a highly critical evaluation of plaintiff's performance over the past year stating she found, "a complete and utter disconnect with regard to his thought process and patient care," and describing incidents of failures in care that she witnessed, including:

> [I]nability to follow directions . . .  Inappropriate female examinations (persistently after being told multiple times not to have fingers near or on the clitoris) . . . Again, in the realm of inappropriate examinations-multiple vaginal examinations on patients who are in active labor or patients with preterm premature rupture of membranes. He tends to just examine women without any rhyme or reason . . . . Tendency to present the same patient to multiple providers until he hears what he wants. At times he tends to omit key components of a medical history . . . He has a complete inability to prioritize (e.g, needing to call a cardiac consult on a patient with long-standing tachycardia is seemingly more important that a patient who is about to deliver[] her baby) . . . Starting medications on patients without discussing it with the on call attending(s) . . . Ordering studies on patients without discussing it with his senior resident or on call attending(s) . . . I have witnessed inappropriate verbal communications with multiple female residents as well as house staff. . . . Inability to follow orders from female senior residents.

(Def. Ex. A-22.)  Approximately two weeks after the allegations of inappropriate touching by plaintiff, LMC's Ms. Kakleas (Designated

Institutional Officer) and Candy Finklestein (Quality Assurance)
conducted an investigation of the allegations, interviewing Dr.
Marecheau and others, and could not substantiate Dr. Marecheau's
claims regarding the inappropriate touching.  (JA(2)-030.)  Dr.
Marecheau, however, explained further at deposition that she
recalled instances of inappropriate hand placement during vaginal
deliveries.  (*See* JA(7)-027.)  Further, she stated, residents at LMC
perceived plaintiff as a loner with bizarre behavior.  (*See* JA(7)-
030 - JA(7)-031.)   Plaintiff points to a text conversation where
Dr. Marecheau appears to refer to plaintiff as "coocoo for cocoa
puffs", but submits no evidence by which the court can ascertain
that the phrase refers to plaintiff as opposed to the "Frida"
mentioned in the same text.  (See Menken Decl., Ex. 18.)

On October 15, 2014, members of LMC's OB/GYN leadership
discussed plaintiff and made the decision to place plaintiff on a
paid administrative leave of absence and refer him to Occupational
Health Services ("OHS") to determine his fitness for duty.   The
decision was reviewed with LMC's legal counsel and human resources
and shared with LMC leadership.  (See Def. 56.1 at ¶ 33.)

A meeting was held on October 16, 2014, wherein Dr.
Fitzpatrick, Dr. Thompkins, plaintiff, and Mr. Pabon discussed
plaintiff's brief tenure and incidents at MSK and the need for
plaintiff to go on administrative leave.  (Def. Ex. A-23.)  The
notes describe Dr. Fitzpatrick's statement of LMC's concerns with

plaintiff's difficulty prioritizing and issues with patient care. (*Id*.)  Plaintiff was advised of LMC's plan to "take him off service (no patient care) and have [him] undergo an evaluation."  (*Id*.) Plaintiff stated that he was surprised that he was taken off service and stated that he ran all his decisions by fellows.  (*Id*.)  Dr. Fitzpatrick responded that there was a "recurrent theme" that plaintiff could not prioritize and stated, "we need to get you diagnosed.  We are not getting punitive; we need to help you solve this so that you can get back on track . . . . We want you to do well, graduate, pass boards, and get a nice job. . . ."  (*Id*.)  Dr. Fitzpatrick emphasized that this leave and evaluation were being requested to help plaintiff get back on track and prevent the evaluations from getting worse, but plaintiff consistently stated that he wasn't sure what the issues were and needed specific examples. (*Id*.)  Plaintiff further responded to criticisms by asking why he was being labeled when other residents also had issues. (*Id*.)  Dr. Fitzpatrick responded that other residents have thrived, but plaintiff had not, and that people were not comfortable with him managing the floor or their patients.  (*Id*.)  Dr. Fitzpatrick directed plaintiff to reach out and make an appointment for the evaluation and that they would meet again after the evaluation. (*Id*.)

Plaintiff eventually scheduled a meeting with Dr. Steven Salvati for October 16, 2014, at Occupational Health Services

("OHS") for his recommended evaluation.  Prior to the meeting, Dr. Salvati had never seen or spoken to plaintiff. (JA(8)-004 – JA(8)-006.)  Dr. Salvati described receiving a referral from Ms. Kakleas regarding plaintiff's behavioral issues and a list of concerns with plaintiff. (JA(8)-005.)  Dr. Salvati confirmed at deposition that during the evaluation plaintiff behaved respectfully, expressed insight, and, to the best of his recollection, did not express anti-female animus. (JA(8)-008.)  However, because of the disconnect between the comments and allegations made and plaintiff's' total lack of understanding as to why some of the comments or allegations were made and insistence that they were unjustified, Dr. Salvati felt a psychological or psychiatric evaluation was needed. (JA(8)-009 – JA(8)-010.)  Dr. Salvati referred plaintiff for an Independent Medical Evaluation, which was conducted by Dr. Melanie Israelovitch of Mount Sinai Beth Israel. (*Id.*; see also JA(1)-049 – JA(1)-050.) The decision to refer plaintiff to a psychiatrist was made exclusively by Dr. Salvati and not by other staff or doctors at LMC, however, the psychiatrist was selected by LMC. (JA(8)-013 – JA(8)-014.)  On October 30, 2014, Dr. Israelovitch issued a report diagnosing plaintiff with an unspecified personality disorder, and stating: [ • ]. (Def. Ex. A-29. [3])  Plaintiff described Dr.

---

[3] The court provides citations to page numbers of the relevant text it considered and refers to from the text of the Sealed Goldbloom Report, Def. Ex. A-38 and Sealed Israelovitch Report, Def. Ex. A-29, rather than the direct quotations, as the exhibits are presently under seal. Such omissions of direct quotations are indicated by " [ • ] ".

Israelovitch as issuing him "a clean bill of psychiatric health," (JA(1)-053 – JA(1)-056), and emailed Dr. Fitzpatrick on November 6, 2014, stating that Dr. Israelovitch assured him that the session with plaintiff went well and plaintiff would be returning to work. (*See* Def. Ex. A-31.)  However, plaintiff reported being "surprised" when he saw Dr. Israelovitch's written report as he believed it was different from what she told him at the evaluation session.  (JA(1)-056 – JA(1)-058.)

Dr. Salvati did not share Dr. Israelovitch's report with LMC.  However, after receiving the report, Dr. Salvati emailed Dr. Israelovitch on November 4, 2014 asking, "Do you believe that Dr. Stolpner is fit to return to his job duties presently while he seeks/obtains the recommended psychotherapy or should he seek the therapy, to further determine any underlying behavioral health issues, prior to resumption of duties. Your additional clarification is of significant importance, since this is a major issue that will be addressed when the recommendations are discussed with his Chairman and his residency Program Director."  (Def. Ex. A-30.)  Dr. Israelovitch responded that this question "is very difficult if not impossible to answer . . . . His program director and chairman will need to make that determination though with good and intensive treatment and very close supervision, I believe that he could be given the chance to return to work."  (*Id.*)  Dr. Salvati, in turn, reported to OB/GYN leadership at LMC that Dr. Israelovitch was inconclusive about whether

plaintiff could resume work immediately and found the following: that there was significant disparity between plaintiff's perception of his performance in the residency program and LMC's evaluation of plaintiff, that plaintiff did not meet the criteria for any psychiatric disorders, that she diagnosed plaintiff with an unspecified personality disorder, that she believed plaintiff might be given the chance to return to work with intensive therapy and close supervision.  (*See* Def. 56.1 at ¶ 46 (citing Pl. Ex. 21-22[4]; JA(8)-011 – JA(8)-012, JA(8)-015, JA(8)-018 – JA(8)-023; JA(2)-038 – JA(2)-041, JA(2)-043 – JA(2)-044; JA(10)-014 – JA(10)-015; JA(10)-007 – JA(10)-008; JA(4)-053 – JA(4)-054).)

On November 4, 2014, after receiving Dr. Salvati's report, Dr. Fitzpatrick, Dr. Kesavan, Ms. Kakleas, Laura Alfredo (LMC's in-house counsel), and Candy Finkelstein met and reached consensus that plaintiff should be medically cleared as fit for duty before returning to work.  (Pl. Ex. 21-22; JA(10)-018 – JA(1)-020; *see also* JA(2)-045; JA(4)-052; JA(4)-055.)  Ms. Kakleas believed that they should get plaintiff help and was of the opinion that "C.P.H. is usually a good resource for physicians who need help."  (*Id.*)  Ms. Kakleas' recommendation of the Committee for Physician Health ("CPH"), a division of the New York State Medical Society, was based on her prior experience with physicians who were referred to CPH to assist them

---

[4] All references to Plaintiff's exhibits marked at Jenny Kakleas' deposition taken on March 21, 2017 and attached to the Declaration of Roger H. Briton, Esq. as Exhibit D are referred to herein as "Pl. Ex. __" where the "__" represents the number the exhibit was assigned at deposition

with behavioral issues. (JA(10)-020 – JA(10)-023.) The other others at the meeting agreed. (*Id.*) CPH describes itself as providing "confidential, non-disciplinary assistance to physicians . . . suffering from substance abuse and other psychiatric disorders while protecting public safety" and identifies "Concern about the health of yourself or a colleague" and "deterioration of professional performance/relationships" as common reasons for referrals to CPH. (Pl. Ex. 25.)

On November 6, 2014, Dr. Kesavan informed plaintiff that Dr. Israelovitch's evaluation was inconclusive. (Def. Ex. A-31.) Plaintiff asked to review the report and Dr. Salvati provided the report to him the next day. (Def. Ex. A-32.) Plaintiff met with Dr. Fitzpatrick, Dr. Kesavan and Ms. Kakleas who explained that plaintiff's paid administrative leave was being changed to a medical leave of absence, during which plaintiff would be evaluated by CPH. (Def. 56.1 at ¶ 51 (citing JA(1)-059; Def. Ex. A-34; Pl. Ex. 27).) Despite having reviewed Dr. Israelovich's evaluation and the doctor's email exchange with Dr. Salvati, neither of which declared plaintiff "fit for duty," plaintiff emailed LMC on November 13, 2014 stating:

> Dr. Israelovitch has cleared me fit for duty, so at this point I can't file for [medical] leave. I have also spoken with CPH, who have stated to me that they deal with psychiatric disorders and substance abuse. I don't have any of these issues and I have cleared my evaluation so I am not fit for evaluation by this organization.

(Def. Ex. A-34.) Plaintiff explained his view of the inconsistency in what he perceived to be Dr. Israelovitch's oral statement to him and

her written recommendation regarding his return to work, saying that plaintiff relied on his "conversation with [Dr. Israelovitch], and [his] understanding . . . [that] she said [plaintiff] should be able to go back to work." (JA(1)-061.)  Plaintiff emphasized that "in my view . . .  I was cleared in my perception from my conversation with Dr. Israelovitch and the email . . . . I should have been able to return to work." (JA(1)-062 – JA(1)-063.)  Plaintiff describes Dr. Israelovitch's written recommendation in his 56.1 statement alternately disputing Dr. Israelovitch's evaluation, saying "Dr. Israelovitch, who was affiliated with Beth Israel Medical Center in Manhattan, issued a report with a 'diagnosis' of unspecified personality disorder, which is not a 'real' diagnosis or disorder," and, saying "In a November 4, 2014 email to Dr. Salvati, Dr. Israelovitch indicated that Dr. Stolpner was fit for duty and could return to work at that time."  (Pl. 56.1 at ¶¶ 52, 55.)

### D.  PLAINTIFF'S TERMINATION

CPH referred plaintiff to several psychiatrists for an evaluation and Plaintiff selected Dr. David Goldbloom.  (JA(1)-068.) Plaintiff met with Dr. Goldbloom on December 24, 2014 and January 8, 2015.  At the request of Dr. Goldbloom, Plaintiff also submitted to Neuropsychological Testing.  Dr. Chriscelyn Tussey of the Metropolitan Forensic & Neuropsychological Consultation conducted the tests and provided Dr. Goldbloom with a preliminary report dated February 7, 2015.  Dr. Goldbloom issued his report on February 11,

2015, and Dr. Tussey issued a final report on February 14, 2015. (*See* Def. Ex. A-38.)   Dr. Goldbloom's report notes that plaintiff told him that he was on administrative leave due to an unfavorable evaluation by Dr. Carol Brown of MSK.  (*Id*. at 692.) The Goldbloom report lists the sources of information consulted in the drafting of his report as: Dennis Stolpner, M.D., Dr. Steven Salvati, Dr. Fitzpatrick, Dr. Meera Kesavan, Ms. Kakleas, an evaluation by Dr. Brown, Dr. Marecheau, Dr. Shahem, and Dr. Ryncarz. (*Id*. at 691.) Dr. Goldbloom describes meeting with plaintiff and plaintiff's insistence that there was a justification for his actions in relation to each complaint or negative evaluation plaintiff received, even when plaintiff confirmed that he disobeyed direct orders from an attending physician in a supervisory role.  (*Id.* at P691 - P693.)  Further, Dr. Goldbloom noted the inconsistency in what Dr. Salvati said regarding plaintiff's ability to return to work following administrative leave, and what plaintiff believed was said, [ • ].  (*See Id*. at P692-693.)  However, an LMC email dated November 13, 2014, advised plaintiff that Dr. Salvati did not clear plaintiff to return to work and that plaintiff was being placed on medical leave.  (*See* Def. Ex. A-35.)  Dr. Shahem, an OB/GYN attending at LMC whose name plaintiff offered when Dr. Goldbloom asked for names of attending physicians that would speak favorably of working with plaintiff, described plaintiff as exhibiting compulsive behavior.  (Def. Ex. A-38 at P695.)  Dr. Shahem had

worked with plaintiff for two years and described plaintiff to Dr. Goldbloom. (*See Id*. at P694-695.) Dr. Goldbloom reported that when he presented some of Dr. Shahem's statements to plaintiff, plaintiff replied [ • ]. (*Id.*)

Dr. Ryncarz, another OB-GYN attending who plaintiff volunteered as a positive reference for Dr. Goldbloom to contact, had worked with plaintiff for 1.5 years and described plaintiff as [ • ]. (*Id.*) Dr. Ryncarz also informed Dr. Goldbloom that plaintiff needed to focus on teamwork skills and, [ • ].

During his interview with Dr. Goldbloom, Dr. Fitzpatrick informed Dr. Goldbloom that LMC attempted to counsel plaintiff about how he could improve at his six-month evaluation. Dr. Fitzpatrick also stated that around that time [ • ]. (*Id* at P697.) Dr. Fitzpatrick agreed with Dr. Goldbloom that plaintiff [ • ]. (*Id.*)

Dr. Goldbloom also interviewed Dr. Kesavan, who provided multiple examples of behavior by plaintiff that caused patient care concerns, and stated that plaintiff was defensive when confronted, though not in a hostile way. (*Id*. at P698.) Dr. Kesavan cited an example of plaintiff being told he needed to inform a team before entering a delivery room and instructing a patient [ • ] and a situation where plaintiff ignored an attending's direction that a patient who had an incomplete abortion and was bleeding and needed a D&C and instead treated a patient with shortness of breath. (*Id.*)

On January 8, 2015, Dr. Goldbloom met with plaintiff a
second time and advised that he would refer him for
neuropsychological testing.  (*Id.*)  Dr. Goldbloom had experienced
firsthand what others described as plaintiff's inability to process
instructions.  (*Id.* at 0698.) In his report, Dr. Goldbloom stated
that he explained to that he would call plaintiff to set up a date
and time for their initial meeting after discussing the payment for
the evaluation by his residency program.  (*Id.*)  Plaintiff then
called Dr. Goldbloom the next day to set up the appointment.  (*Id.*)
Dr. Goldbloom explained his own reaction saying, [ • ].  (*Id.*)

Plaintiff had the opportunity to review the Goldbloom
report and stated that the report accurately reflected what
plaintiff told Dr. Goldbloom.  (JA(1)-066.)  However, plaintiff
criticized Dr. Goldbloom for [ • ] and said he believed there was
language in the report that suggested [ • ] insisting that his
quotes were taken out of context.  (*Id.*)  Further, when questioned
about the individuals who Dr. Goldbloom interviewed or received
statements from, he had differing explanations for their criticisms
– "I believe some of the attendings did perceive me as disabled.  I
think others made statements that are inaccurate and incorrect."
(JA(1)-070.)

Dr. Tussey conducted a neuropsychological examination of
plaintiff over the course of nine hours between January 27, 2015 and
January 31, 2015.  In her report, Dr. Tussey found that plaintiff

was intelligent with a particular strength in vocabulary and working memory.[5] She noted that plaintiff's relative cognitive weaknesses were in the low average to average range, but emphasized that [ • ]. (Def. Ex. A-38 at P698-699.) Dr. Tussey further reported that [ • ]. (*Id.*) Dr. Tussey suggested that a diagnostic consideration for plaintiff was Obsessive Compulsive Personality Disorder, but did not identify plaintiff as suffering from the disorder at the time she completed the report. (*Id.* at P700.) Based on his and Dr. Tussey's analysis, Dr. Goldbloom recommended that plaintiff would benefit from participating in CPH, which entailed receiving treatment and work-site monitoring. (*Id.* at P701.) He specifically noted that, [ • ]. Dr. Goldbloom also suggested that a worksite monitor or mentor work with Dr. Stolpner to address the weaknesses noted in the reports. (*Id.*)

Dr. Tussey recommended steps like plaintiff writing down information provided by attending physicians and focusing on a single task at a time, though she acknowledged the single-task approach would be difficult in a clinical setting. (*Id.*) Dr. Stolpner stated that plaintiff is [ • ] and, [ • ]. (*Id.*) The report also noted that, [ • ]. (*Id.*) Dr. Goldbloom recommended that plaintiff return to work with as many of the accommodations

---

[5] Neither party submits Dr. Tussey's complete final report, although Plaintiff submits an excerpt of the final report as Menken Decl., Ex. 12.

noted in the report as possible.  However, the report was not provided to LMC.[6]

During plaintiff's medical leave, plaintiff was forbidden from reporting for duty to the hospital.  (JA(2)-053.)  Plaintiff asserts that while he was on medical leave pending a CPH evaluation, LMC made *no effort* to remediate plaintiff's alleged job performance problems and failed to remediate issues identified by LMC upon plaintiff's return from his leave of absence.  (JA(4)-056; JA(2)-054 – JA(2)-055.)   In response to a question regarding remediation efforts for plaintiff's problems, Dr. Fitzpatrick responded, "we had no perception of problems[,] [w]e had issues with outcomes," specifically, the reason he was not performing at the appropriate level for a PGY-3. (JA(2)-055 – JA(2)-056.)  Dr. Fitzpatrick further explained that LMC took remedial measures such as placing plaintiff on the maternal fetal medicine service to ease him back into his work and encouraging plaintiff to meet with his CPH monitor on a regular basis.  (*Id*. at 055.)   LMC did not have access to the Goldbloom Report or Tussey Report, so it is unclear which, if any,

_____

[6] Plaintiff's 56.1 statement speculates that it is likely that plaintiff's psychological evaluations were available to LMC without citation to any evidence that supports its claim, however LMC provides undisputed evidence supporting its assertion that the Goldbloom Report and the Tussey Report were not provided to anyone at LMC; instead copies were obtained by plaintiff's counsel and produced in discovery.  (Kakleas Aff. ¶¶ 8-9; Pl. 56.1 at ¶ 58; JA(1)-064 - JA(1)-065.)  Leadership at LMC was not made aware of the fact that plaintiff's leave of absence was a medical leave at the time, and LMC determined it would not divulge information as to the reason for plaintiff's extended leave of absence.  (*See* JA(2)-053.)

of the suggested accommodations recommended by Dr. Tussey were communicated to LMC.

Upon plaintiffs' return from medical leave Dr. Kesavan acted as plaintiff's workplace monitor until she left unexpectedly for maternity leave on June 22, 2015 over plaintiff's objection, (Def. 56.1 at ¶ 81.)  In that role Dr. Kesavan established a plan for helping plaintiff address certain issues. (Def. Ex. A-41.) These included directing plaintiff to use flash cards when presenting and signing out patients to improve communication and care transitions.  (*Id.*)  She also intended to have frequent meetings with plaintiff.  (*Id.*)  Plaintiff was also assigned a treatment monitor, Dr. Faina Yablochnikova, a psychologist.  (JA(4)-067; JA(1)- 071-072.)  Moreover, on June 28, 2015, Dr. Janine Doneza, Chief OB/GYN resident at the time, asked to meet with plaintiff to assist with his work, but it is unclear whether plaintiff met with Dr. Doneza.  (*See* Def. Ex. A-55.)  Plaintiff argues that LMC's policies required remediation to correct its residents' performance problems.  (See Pl. MOL at 13 (citing JA(2)-016-017.))  Plaintiff cites the deposition testimony of Dr. Fitzpatrick, who testified that during his time at LMC, certain residents received remediation and other residents were placed on probation, but he doesn't know how many, and that one resident was terminated.  (*See* JA(2)16-17.)  Dr. Fitzpatrick does not state that remediation of residents at LMC was governed by any particular

policy, nor does the exhibit cited by plaintiff, Menken Decl., Ex.

6, require one.  LMC's OB/GYN Residency Manual states the following

regarding dismissal:

> Dismissal or reappointment without promotion may be
> considered for disciplinary reasons or unsatisfactory
> clinical performance.  Prior to considering this, the
> Program Director *may*:
> - Document appropriate counseling of the resident,
>   including efforts at remediation
> - Make available reasonable assistance and/or make
>   sure that the resident is aware of the
>   availability of confidential counseling or other
>   resources.
> - Provide reasonable opportunities for the
>   resident to demonstrate improvement.  Bring [it
>   to] (sic) the action to the attention of the DIO
>   and GMEC.

(Menken Decl., Ex. 6 at D003591 (emphasis added).)  The program

manual further states that, "Remediation and probation may also be

used at any time during the year when a resident is having

difficulty."  Although remediation itself is not mandatory, a

description of remediation includes the written plan of remediation

cited by plaintiff, which is described as including "specific issues

to correct, steps to correct them, and a timeline."  (*Id*. at

D003592.)

Dr. Kesavan took extensive notes on her interactions with

plaintiff following his return to LMC on April 23, 2015, following his

medical leave and CPH evaluation.  Dr. Kesavan was plaintiff's

assigned mentor and discussed various issues plaintiff faced after his

return to LMC with plaintiff.  (*See* Def. Ex. A-50.)  Plaintiff's

issues at LMC resumed almost immediately following positive March 27,

2015 comments from Dr. Shailini Singh, who reported to Dr. Kesavan that plaintiff asked insightful questions and was doing well on the Maternal Fetal Medicine rotation as it was a more isolated rotation. (*Id*. at LMC 155.)

By early April 2015, plaintiff cited concerns about getting enough gynecology cases and reported that he was having communication difficulties and not working well with Dr. Carlos Rondon, house physician.  Dr. Kesavan investigated plaintiff's complaint and was advised by Dr. Rondon that he disapproved of the manner in which Dr. Stolpner spoke to him, prompting Dr. Kesavan to remind plaintiff that working in a team was a part of patient care.  (*Id*.)  Plaintiff also reported communication difficulties with Dr. Colon and plaintiff and Dr. Kesavan discussed ways that plaintiff and Dr. Colon could better communicate.  When Dr. Kesavan asked plaintiff when he would meet with CPH, plaintiff told Dr. Kesavan that he "really didn't think he had to follow up with them." (*Id*. at LMC 156)  After Dr. Kesavan reminded plaintiff that the terms of his return required him to follow up with CPH, plaintiff did so a few weeks later.  (*Id*.)

In April to June 2015 Plaintiff repeatedly continued to complain about his interactions with other attendings and cited multiple instances of feeling disrespected, and other doctors complained about plaintiff.  (*Id*. at LMC 156-157.)  After complaints during a period of approximately one month between April and May 2015 Dr. Kesavan attempted on May 8, 2015 and May 11, 2015 to explain to

33

plaintiff that much of the perceived disrespect might be a result of plaintiff's personal perception.  (*Id*.)  Shortly after the May 8, 2015 discussion, Dr. Kesavan noted that plaintiff appeared to feel like he was making progress, and said he was "overall happy with the way things were going in the program."  (*Id*.)  However, by May 16, 2015, plaintiff again emailed Dr. Kesavan complaining about communication issues with attendings and colleagues.  (*Id*. at LMC 157.)  Around this time, house physician Dr. Carlos Rondon requested not to work with plaintiff in the future. (*Id*.)  Dr. Kesavan urged plaintiff to discuss his concerns with CPH, and Dr. Kesavan advised plaintiff and Dr. Rondon that some accommodations could be made, but she could not always keep them off service together, and after a meeting with CPH on or before March 27, 2015, plaintiff appeared improved.  (*Id*.)

     As before, the reprieve from complaints by and about plaintiff, and negative evaluations was short-lived.  On June 1, 2015, residents complained that Dr. Stolpner sent a junior resident to conduct rounds, which involve evaluating patients alone, drawing criticism from the resident team and Dr. Kesavan as they felt sending the junior resident on rounds alone was inappropriate.  (*Id*. at LMC 158.)  On June 6, 2015, Dr. Kesavan noted that she was told by several different sources that plaintiff was still unable to appropriately write post-operation orders on an ambulatory case. (Id.)  To address this concern, Dr. Kesavan asked Dr. Elaine Aguinaldo to sit with plaintiff and review all ambulatory orders to help improve

his ability to write postop orders. (*Id*.) Dr. Aguinaldo complied with Dr. Kesavan's request but later expressed uncertainty over how much plaintiff absorbed despite her repeated review of the orders with plaintiff. (*Id*.) From June 12-15, 2015, several residents complained about Dr. Stolpner's sign-outs, prompting Dr. Kesavan to speak with senior residents Dr. Doneza and Dr. Artiles who agreed to speak with plaintiff to "better help him." (*Id*. at LMC 159.) However on June 13, 2015, Dr. Kesavan was informed by Dr. Faris that plaintiff incompletely signed out a patient leading to a failure to hand-off the patient. Dr. Kesavan informed plaintiff that this type of mistake can affect patient care, and advised him to take more care with hand-offs, but Dr. Stolpner attributed the mistake to a technology issue and technical mistake plaintiff made. (*Id*. at 159)

Dr. Kesavan provided plaintiff with a requested accommodation of taking an evaluation ahead of his board examinations at his request, plaintiff stated that he believed Dr. Kesavan "had a perception . . . that there was something wrong with me and I was somehow disabled and . . . could not practice medicine independently," plaintiff, "thought she was trying to be helpful and she had positive intentions, but I do believe that her perception of me was that I was that I did not have the capacity to function as an OB/GYN resident, which I think is evident even as early on as June 4th through the correspondence -- through the charts that I have been reading that you have sent me." (JA(1)-083 – JA(1)-084.) The volume

35

of criticisms of plaintiff's proficiency in OB/GYN, some of which came from people plaintiff selected as positive references, did not appear to detract from plaintiff's own opinion of his skill level and lack of need for improvement, given his view that criticisms were "based on perception and not on objectivity."  (JA(1)-080.)

Plaintiff completed a self-assessment for the second half of 2014 on March 30, 2015.  In it he rated himself as proficient or higher in every category, despite his colleagues' evaluations to the contrary, and plaintiff's own allegations that he received inadequate mentoring opportunities.  (JA(1)-078 – JA(1)-079; see generally JA(1)-078 – JA(1)-094.)  Plaintiff also alleged that other similarly situated residents received remediation, but offered inadequate evidence to establish that the residents were similarly situated. (Pl. MOL at 13-16, 25.)  Despite the documented continued flow of communications and remedial steps taken by Dr. Kesavan, plaintiff asserted that Dr. Kesavan was not available when he needed to discuss issues he faced and that he only received one instance of remediation. (JA(1)074-JA(1)-075.)

In June 2015, Dr. Kesavan drafted a "Resident Milestone Evaluation: Year-End 2014-2015" detailing plaintiff's progress since his return to LMC.  (Def. 56.1 at ¶ 86.)  The OB/GYN Clinical Competency Committee or "CCC" met on June 4, 2015[7] to discuss the

---

[7] Although the defendant's 56.1 statement at ¶ 86 states that the meeting occurred on June 4, 2014, Def. Ex. A-52 is the June 4, 2015 Clinical Competency Committee Meeting Notes.  The court notes that 2015 is the correct year.

evaluation and Dr. Kesavan scheduled a meeting to discuss the
evaluation with plaintiff on June 17, 2015. (*Id.* at ¶¶ 88-89.)
The meeting was first postponed due to a conflict with plaintiff's
CPH treatment monitor, and then postponed due to Dr. Kesavan's
unexpected departure on June 22, 2015, for issues related to her
pregnancy. (*Id.*) Dr. Faris then assumed the role of Associate
Program Director and plaintiff's mentor. (*Id.*) Within a week of
the transition, plaintiff contacted Dr. Faris and others with
repeated complaints about other residents, including a complaint
that one individual's lack of communication jeopardized patient
care. (*Id.* at ¶¶ 90-92.)

On July 9, 2015, Dr. Fridman, an attending, completed an
"End of Rotation Evaluation" of plaintiff's performance from June 1
to June 28, 2015 and rated plaintiff as below competent and novice
level, commenting that plaintiff had "very limited clinical
judgment," was "unable to prioritize," and was "not competent [to]
teach medical students or junior residents." (*Id.* at ¶ 93 (citing
Def. Ex. 58 at LMC 114).) Dr. Fridman also wrote that plaintiff was
not trustworthy because he lacked clinical judgment and could not
manage in a stressful situation. Dr. Fridman noted that despite the
stated deficiencies, plaintiff followed directions well in the
operating room and respected hospital staff. (*Id.*)

Dr. Fridman submitted another evaluation a month later for the period from July 1 to July 26, 2015 where he again gave plaintiff an overall novice rating and commented:

> Weak resident, poor clinical judgment! His inability to prioritize coupled with slow decision making makes for a dangerous combination. High Stress, fast paced with frequently urgent environment of Ob/Gyn specialty is not appropriate for him. Resident frequently focuses [on] unimportant and irrelevant details, yet ignores the patient and performs unreliable physical exams.

(*Id.* (citing Def. Ex. A-59 at LMC 139).)    On the July 9, 2015, Dr. Marechau emailed Dr. Faris to raise concerns regarding inaccuracies in a recent sign out by plaintiff stating, "he had NO KNOWLEDGE of the patients when he is on call," citing two instances when plaintiff did not know information about the patients  (*Id.* at ¶ 94 (citing Def. Ex. A-64).)    Plaintiff emailed Dr. Faris the same day to complain that Dr. Marecheau and Dr. John Ilgan loudly berated him in front of others after an incomplete sign out, explaining that he only gave an incomplete signout regarding a patient because of issues with charting and a nursing report he was not responsible for.  (*Id.* at ¶ 95 (citing Def. Ex. A-65).)  On July 14, 2015, Dr. Ilgan, prompted by a conversation with Dr. Marecheau wherein she advised him to voice his complaints, emailed Dr. Faris, Dr. Fitzpatrick, Dr. Contreras and Dr. Kesavan with "[g]rave concerns" regarding plaintiff and stated the following:

> In two separate morning reports, he gave horrifically inaccurate sign outs on two patients that I knew well. When I was told that they were my patients I told him directly that "I thought I was going crazy, because what

was presented sounded nothing like the patients that I had seen." I told him that I would expect a quality H&P from medical students. He was discussing a patient in front of 40 people at morning report and he was horrifically unprepared. He stated he was busy all night. He mentioned "that was the history that was signed out to me." There is no excuse to regurgitate a sign out from someone else at morning report. If that was the case, he must not have seen the patient, reviewed their chart or examine[d] them whatsoever. These poor sign-outs are rarely excusable for an intern, but are totally reprehensible for a senior resident. I witnessed his evasive nature and lack of explanation when dealing with poor signouts given to co-residents. He perpetually finds ways to blame others or excuse himself for his poor performance. I have rarely mentioned this regarding prior trainees, but I cannot see how Dr. Stolpner is fit to work as a resident, evaluate patients independently or work within a team healthcare environment. Only once before had I openly recommended that a resident be terminated. <u>Clearly, Dr. Stolpner is not fit to be a resident, provide care to patients and he should be terminated</u>. Continuation as a resident and eventual graduation could make us individually or the hospital culpable for future poor patient outcomes including possible maternal deaths, if we inappropriately graduate him from the program.

(*Id.* at ¶ 97 (citing Def. Ex. A-67 at LMC 222(A)-223(A)

(emphasis in original)).) Dr. Faris asked for specific examples of

what was wrong with the sign-outs and Dr. Ilgan provided

descriptions of a sign out for a patient evaluated for epistaxis and

a patient with a vanishing-twin pregnancy. (Def. Ex. 67 at LMC

220(A)-221(A).) Plaintiff responded to Dr. Ilgan's complaints,

claiming that Dr. Ilgan accurately reported one incorrect sign-out

but, for reasons beyond plaintiff's knowledge, "blatantly lied"

about plaintiff's sign-out with regard to the patient evaluated for

epistaxis. (JA(1)-089 – JA(1)-091.)

On July 20, 2015, another attending, Dr. Rosemary Ruggiero, emailed Dr. Faris complaining that plaintiff failed, for a two hour period between 3:00 a.m. and 5:00 a.m. on July 11, 2015, to properly assess a patient with a ruptured ectopic pregnancy and failed to reach out to Dr. Ruggiero about the emergency situation and when the patient was taken to the operating room, she had lost two liters of bloold.  (See Def. 56.1 at ¶ 100.)  Dr. Ruggiero further stated, "Dr. Stolpner does not possess the ability to recognize medical emergencies and has absolutely no sense of urgency. My sense is that placing him on call as the higher ranked resident is a disservice to him and the patients. I believe this is the overwhelming sentiment of all of the providers."  (Def. Ex. 66.) Plaintiff did not believe Dr. Ruggiero's criticism was warranted and at deposition stated, "Dr. Ruggiero judged me in haste, claiming I had no urgency. I think that's a behavioral characterization, and I think that goes again to the perception that I'm incapable of practicing as an OBGYN…." (JA(1)-087.)  However, he acknowledged that a ruptured ectopic pregnancy is potentially a matter of life or death. (JA(1)-088.)

Despite the abundance of criticisms and complaints regarding plaintiff's performance and skill level, on July 14, 2015, plaintiff rated himself as expert or proficient in every category of his Resident Self-Assessment for the period from December 30, 2014 to June 30, 2015, and testified later at deposition that he "was

competent enough to practice as an independent practitioner."
(JA(1)-086.)  Plaintiff continued to be the subject of complaints
during July 2015 that echoed concerns about plaintiff's low fund of
knowledge and inability to follow directions or comprehend feedback.
In one illustrative complaint, Dr. Rodriguez-Dumont, an attending,
provided a description of his attempts to teach plaintiff and
plaintiff's inability to process the feedback for the period of July
1, 2015 to July 26, 2015:

> . . . I have tried to explain and teach Dennis the correct
> approach for management of multiple clinical scenarios.  He
> seems to either not believe my teachings, or is unable to
> assimilate this information.  He has repeatedly been unable
> to repeat back to me what he has learned after I point out a
> mistake on his clinical judgment making impossible to
> corroborate if he in fact has understood his error. Example:
> Dennis wanted to examine a patient in labor without a clear
> indication. He often answers with "I just wanna see whats
> going on."  I sat down and slowly explained why there was no
> need to examine the patient at that time.  I also went
> through what would be the adequate timing of routine
> examination for laboring patients.  I also . . . explained
> clinical scenarios that would indicate the need to deviate
> from routine.  After asking if he understood, I finished my
> explanation.  Dennis stood up and said "ok, I will go
> examine her now".  This shows a complete inability to
> comprehend our training.

(Def. Ex. A-60 at LMC 128.)

After Dr. Faris contacted CPH on or about July 22, 2015 to
apprise them of recent concerns with plaintiff, CPH reached out to
plaintiff.  (*See* Def 56.1 at ¶ 104.)  On July 22, 2015, plaintiff
replied to CPH denying prior knowledge of Dr. Faris' concerns and
stating that the residents and attending physicians were aggressive

and disrespectful to him, that nurses refused to follow his requests, that Dr. Kesavan did not respond to emails from him, and describing the behavior of certain people at LMC as incomprehensible and malicious. (*Id.* (citing Def. Ex. A-68).) Plaintiff's CPH monitor responded in part that, "[t]o be 'right' is not the goal here. It is for you to accept feedback and I agree with you that it has to be specific if you want to be able to change." (*Id.*)

Following the steady stream of complaints about plaintiff, the CCC met on July 23, 2015 to discuss plaintiff's performance and future at LMC. (*Id.* at ¶ 105.) Dr. Cedric Olivera, the Committee Chair, Dr. Fitzpatrick, the Department Chair, Dr. Faris, the Associate Program Director, Dr. Kesavan, the program director, and attending physicians Dr. Aglialoro, Dr. Contreras and Dr. Morgan attended. (*Id.* (citing Def. Ex. A-69; JA(4)-068 – JA(4)-069).) The minutes raised the following critical concerns:

> A discussion was held to address the increasing number of complaints received on this resident in recent months. Several cases were brought forward to the committee to discuss Dr. Stolpner's patient care and lack of escalation. *The number of faculty complaints regarding the resident's clinical competency has increased and has reached critical levels. The attending faculty feel that this resident is performing below acceptable levels. He has been evaluated as a novice, which is not appropriate for his PGY level. This has raised important concerns regarding his ability to independently care for patients.*
>
> An incident which recently occurred involved a patient with an ectopic pregnancy who was unstable in the ED. Dr. Stolpner responded to a consult and was "waiting for beta." . . . He was not able to appraise the acuity of the patient's condition. This patient may have suffered serious consequences of such a decision, including death. This is a

diagnosis that should have easily been made by a PGY1 in the latter half of their first year. The fact that Dennis at a PGY 3 level was unable to make the appropriate diagnosis is a serious deficiency.

Dr. Stolpner felt that some of the attendings were exhibiting unprofessional behavior towards him. A witness to the interaction between Dr. Stolpner and the attendings in question stated that there was no unprofessional behavior exhibited by the faculty. This type of reaction may be the resident's attempts to deflect attention from his abilities and behavior.

The resident does not exhibit ownership of responsibility and appears to misrepresent facts regarding patient care. Such misrepresentation of facts during rounds, or presentation of patients has concerned faculty sufficiently to raise concerns regarding the validity of Dr. Stolpner's information, knowledge and his ability to care and treat patients. This misrepresentation has occurred at all facilities he has worked including Memorial Sloan Kettering and Long Island College Hospital. At Memorial he was removed from direct patient care due to patient safety concerns.

(*Id*. (emphasis added)) The CCC found that plaintiff "posed a danger to patient safety," was unable to "ascertain a patient's acute condition and may not be able to achieve clinical competence," and needed to be "removed as soon as possible from all clinical duties and [ ] given [ ] required notice." (*Id*. at ¶ 106 (citing Def. Ex. A-69 at LMC 180-181).)

On July 24, 2015, Dr. Ilgan emailed Dr. Fitzpatrick under the Subject "Re Grave Concerns regarding Dr. Dennis Stolpner, stating in part:

[P]atient safety is the number one priority. Dr. Stolpner is not just unsafe, he would be a dangerous physician, if he independently cared for patients . . . . Dr. Stolpner is an extremely unsafe resident physician who fabricates patient histories, does not personally evaluate patients himself,

> [a]nd is quick to give unjustifiable reasons for his
> inadequacies in patient histories, assessments and plans.
> Moreover he feels very comfortable publicly sharing his
> woefully inadequate or fabricated patient histories with
> fellow residents and attendings who will assume care of the
> patients.  The problem is multifaceted, low aptitude if
> medical knowledge, poor work ethic in pursuing patient
> information or performing exams, complete fabrication of
> patient histories to fill talking points and near total
> neglect for patients who need continuous, active and
> involved care on the labor floor.

(Def. Ex. A-67A at DO2972.)

On July 27, 2015, Dr. Fitzpatrick and Dr. Faris informed plaintiff that he was placed on "interim restrictive status" while LMC investigated concerns regarding his performance.  (Def. Ex. A-67 at LMC 219(A).)  Plaintiff emailed CPH the same day stating that he was placed on leave without justification.  (Def. Ex. 72.)  On July 28, 2015, Dr. Fitzpatrick and Dr. Faris met with plaintiff for over an hour to allow him to respond to the facts surrounding seven serious incidents that raised concerns about his abilities as a resident, including the incident involving the ruptured ectopic pregnancy and incidents with inaccurate sign-outs.  (*See* Def. 56.1 at ¶ 111 (citing Def. Ex. A-73).)  Plaintiff was also offered the opportunity to supplement his responses.  (*Id.*)  Plaintiff testified at deposition that he was inadequately prepared to respond and had insufficient records related to the incidents, however, he chose not to supplement his responses based on his belief that, "Lutheran's decision to terminate my employment began long before these cases were constructed against me." (JA(1)-092 – JA(1)-093.)  Despite plaintiff's stated

concern about his lack of records to review the cases, plaintiff testified at deposition that he did not personally request access to additional information regarding any of the cases. (*Id.* at 093-094.) At the July 28 meeting with Drs. Fitzpatrick, Faris, and A. Segal, plaintiff admitted he made some mistakes, but denied primary responsibility for the majority of the seven cases. (*See* Def. Ex. A-73.) When directly asked what he could have done differently, he acknowledged steps he could have taken in the context of the ruptured ectopic pregnancy, wound hematoma and signout incidents to alleviate or prevent the issues that formed the basis of the complaints he faced. (*Id.* at LMC 185-187.) Further, with regard to the "Presentation of Neonatal Demise" case, plaintiff acknowledged that his signout was inaccurate at the meeting and there was no excuse for the failure. (*Id.* at LMC 187-188; *see also* JA(1)-090 – JA(1)-091.) Dr. Faris explained that LMC was concerned due to the volume and temporal proximity of the complaints regarding plaintiff's performance, when, according to her, "most residents complete training with none or very few issues ever arising." (Def. Ex. 73 at LMC 189.) The doctors expressed to plaintiff that this was especially troubling to LMC because issues were occurring with acutely ill patients and given the seniority plaintiff's his residency, soon he and his patients would not have the safety net of the residency training system to catch errors before they negatively impacted patients. (*Id.*) Dr. Faris asked plaintiff whether he could suggest anything the

program could do to assist him or improve, and the minutes indicate plaintiff replied that he was still a resident. (*Id*.)  LMC converted the seven cases and summaries of Dr. Stolpner's "responses" from the July 28 meeting, into individual "case reviews" and presented them to the CCC on July 30, 2017.  (Def. Exs. A-74, 76-81.)

The CCC met again on July 30, 2015 with Dr. Olivera, Dr. Fitzpatrick, Dr. Kesavan, Dr. Faris and attending physicians, Dr. Agliaro, Dr. Contraras and Dr. Shahem.  The CCC voted unanimously to terminate plaintiff from his residency after evaluating the cases.

On July 30, 2015, the CCC met, reviewed the cases, and executed its earlier July 23, 2015, decision to terminate his residency. Some members of the CCC initially supported allowing Dr. Stolpner to continue in the program, though by the end of the meeting everyone was in agreement that he would be terminated.  (JA(5)-040 – JA(5)-041.)  Dr. Faris explained at deposition that of the seven cases, LMC relied on four cases as the basis for plaintiff's termination.  (*See* JA(5)-014 – JA(5)-015.)  The Conclusion of the Clinical Competency Meeting of July 30, 2015 explained:

> The justification for this decision was based upon the very recent cases which were presented which showed poor clinical judgment; inability to perform independent critical thinking and being unable to perform at his PGY level. This pattern has followed this resident through his internship and residency at LICH and even resulted in Memorial Sloan Kettering Cancer Center, during his outside rotation to that facility, to recommend that he be reported to the Department of Health. The Program has undertaken numerous efforts and routes to assist Dr. Stolpner to reach the expectations of the Program, which efforts, include, but are not limited to, referral to Committee for Impaired Physicians, referral to a

psychiatrist, remediation plan, and continuous meetings with the Program Director, with all of these efforts directed towards the remediation of this resident. While the resident realizes that he is making critical mistakes, he seems to be unable to correct himself. The Committee for Impaired Physicians, had no definitive suggestions, treatments or a diagnosis. The need to ensure that patients are not harmed by a doctor is of primary importance and the Program must act to ensure that no patient is harmed during their care/treatment.

(Def. Ex. A-82 at LMC 192.)[8]  Plaintiff was notified of the

determination to terminate his residency on August 10, 2015.  (Def.

Ex. A-85.)

---

[8]      Plaintiff argues that LMC's own retained expert, Dr. Richard Berkowitz, conceded that Dr. Stolpner performed deficiently on only three of the cases.  (Def Ex. A-82 at LMC 192; ECF No. 29, Briton Aff., Ex. J at 12-14 (Berkowitz Report).) This representation mischaracterizes the exhibit it cites.  At no point did Dr. Berkowitz "clear" plaintiff of wrongdoing in one of the four relevant cases. Rather, he opined that "given Dr. Stolpner's history of prior poor performances . . . [the four] cases simply serve as additional examples of substandard patient care . . . consistent with failures in the past," and stated that, "[Dr. Stolpner's] record fully justified his termination." (Briton Aff., Ex. J at 12-15.)  The court has also reviewed the reports of plaintiff's experts, Dr. Quartell, (*See* Briton Aff, Ex. H.), and Dr. Kindzierski.  (*See* Briton Aff., Ex. L.)

Under *Daubert,* "the district court functions as the gatekeeper for expert testimony . . . whether proffered at trial or in connection with a motion for summary judgment," *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (citing ,*Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 22 (2d Cir.1996)).  On summary judgment, just as at trial, "expert testimony should be excluded if it is speculative or conjectural. . . . [and] the admission of expert testimony based on speculative assumptions is an abuse of discretion."  *Id.* The court does not find that plaintiff's expert reports raise a material issue of disputed fact. Plaintiff's expert reports are conclusory in nature of and are based on unsupported speculation and conjecture about defendant's business judgment and practices.

In any event, the court's consideration of the defendant's summary judgment motion does not rely on any expert report because the court is capable of determining whether defendants proffered a legitimate non-discriminatory reason for terminating plaintiff from the LMC OB/GYN residency program.  Moreover, the experts' reports submitted by the parties are not necessary to determine whether the plaintiff has carried his burden of showing that defendant's proffered reasons were pretextual.  The undisputed evidence before the court establishes that a multitude of physicians who worked with plaintiff during his residency at LMC, and time at MSK during that residency, found that plaintiff failed repeatedly to obey direct orders of attending physicians, failed repeatedly to consult with attending physicians, lacked a sufficient fund of medical knowledge and engaged in acts or omissions that risked patient safety.

On August 18, 2015, plaintiff's counsel requested a hearing pursuant to the "Due Process Policy for Discipline of Residents," (Def. Ex. A-86; ECF No. 29, Briton Aff., Ex. G), and a hearing was conducted on February 1, 2016. (Def. Ex. A-88.) At the hearing, both plaintiff and LMC were represented. Dr. Kesavan and Dr. Fitzpatrick testified and plaintiff read a statement into the record, but presented no witness. (*Id.*) At the hearing, plaintiff was allowed to include an exhibit by an outside expert with his closing statement. (*Id.*) The hearing committee met on February 22, 2016 to deliberate and determined that LMC's decision to terminate plaintiff was, "based on just cause and reasonable under the circumstances," and made findings as follows:

> In reaching its decision, the Hearing Committee considered the specific facts that were presented relating to Dr. Stolpner's experience during his one-month rotation to Memorial Sloan Kettering and the four cases that were presented to the Program's Clinical Competency Committee. The Committee believed that these facts supported the Program's determination that Dr. Stolpner did not possess the level of clinical competency, clinical decision-making and independent critical thinking expected of a PGY-3 resident in the Program.

(*Id.*)

## II. Discussion

Defendant's undisputed facts establish that over the course of plaintiff's residency in OB/GYN, plaintiff was the subject of repeated negative evaluations, and written and verbal criticism from "more than 15 attending physicians and five residency Program Directors working at three separate hospitals where Plaintiff served."

48

(Def. MOL at 9.)   The  criticisms noted deficiencies in a range of
areas critical to successful completion of the LMC residency including
frequent disregard of directions from attendings and supervisors,
failure to communicate and cooperate with other physicians, failure to
properly prioritize tasks in a fast-paced OB/GYN environment,
inability to properly assess emergency situations that arose with
patients, failure to communicate properly with hospital staff and
patients, repeated failure to receive or inability to act on
constructive feedback and undertaking actions or failing to act in
such a way that it  posed a threat to patient safety.  Despite the
continued performance-related criticism, plaintiff disregarded most of
the critiques, claiming alternately that the critiques were false,
based on a perception that something was wrong with him, based on
incomplete or inaccurate facts, or due to the mistakes of others.

Given the voluminous and well-documented factual support
that plaintiff was dismissed due to LMC's conclusion that plaintiff
failed to satisfy LMC's requirements for residents and LMC's ongoing
patient safety concerns based on plaintiff's performance, plaintiff
has failed to raise a disputed issue of material fact to support his
argument that LMC impermissibly terminated plaintiff's employment
because plaintiff was "regarded as" disabled.  Defendant has presented
abundant evidence demonstrating that plaintiff was consistently the
subject of negative reviews and complaints regarding his ability to
perform his duties during his time at LMC, including plaintiff's

removal from clinical duties during a clinical rotation at MSK.  As discussed more fully below, plaintiff's bald assertions that the critiques were unjustified and unsupported and plaintiff's claims of disparate treatment are insufficient to defeat summary judgment.

      **E.**    **LEGAL STANDARD**

         **(1)**   Summary Judgment

      Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), "and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "All ambiguities must be resolved in favor of the non-moving party and all permissible inferences from the factual record must be drawn in that party's favor." *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  If the moving party can show that "there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Peterson v. Regina*, 935 F. Supp. 2d 628, 634 (S.D.N.Y. 2013) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)) (internal quotation marks and emphasis omitted).  To defeat a motion for summary judgment, the

non-moving party must identify probative, admissible evidence from which a reasonable factfinder could find in his favor. *See Anderson*, 477 U.S. at 256-257.   It "requires the nonmoving party to go beyond the pleadings and by [his or] her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (citations omitted).  "If, as to the issue on which summary judgment is sought, there is evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (citation omitted).

The Second Circuit has made clear that, "the salutary purposes of summary judgment-avoiding protracted and harassing trials-apply no less to discrimination cases than to . . . other areas of litigation." *Baby v. Nassau Healthcare Corp.*, No. 14-CV-3297, 2017 WL 3279091, at *8 (E.D.N.Y. Feb. 6, 2017), *report and recommendation adopted*, No. 14-CV-3297, 2017 WL 3278901 (E.D.N.Y. Aug. 1, 2017) (citing *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015)) (additional citation omitted).

### (2)   *McDonnell Douglas* Burden Shifting Framework

To prevail on a claim of discrimination brought pursuant to the ADA under the *McDonnell Douglas* Framework: (1) the plaintiff must first establish a *prima facie* case of discrimination; (2) if

the *prima facie* case is established, the burden shifts to the
defendant to offer legitimate, non-discriminatory reasons for the
adverse employment determination; and (3) if the defendant meets
that burden, the plaintiff bears the burden of showing that the
legitimate reasons offered are merely pretextual in order to prevail
on its discrimination case. *See McDonnell Douglas Corp. v. Green*,
411 U.S. 792, 802-804 (1973).

> To establish a prima facie case under the ADA, a plaintiff
> must show by a preponderance of the evidence that: (1) his
> employer is subject to the ADA; (2) he was disabled within
> the meaning of the ADA; (3) he was otherwise qualified to
> perform the essential functions of his job, with or
> without reasonable accommodation; and (4) he suffered
> adverse employment action because of his disability.

*McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013)
(citing *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir.
2006); *accord Forrester v. Prison Health Servs.*, Inc., 651 F. App'x
27, 28 (2d Cir. 2016) (citing *Cortes v. MTA N.Y.C. Transit*, 802 F.3d
226, 231 (2d Cir. 2015)) (additional citation omitted).

"The level of proof a plaintiff is required to present in
order to establish a *prima facie* case of discrimination is low." *De
la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.*, 82
F.3d 16, 20 (2d Cir. 1996) (citing *Chambers v. TRM Copy Ctrs. Corp.*,
43 F.3d 29, 37 (2d Cir. 1994)); see *Abdu-Brisson v. Delta Air Lines,
Inc.*, 239 F.3d 456, 467 (2d Cir. 2001).  If the plaintiff establish
a *prima facie* case and the defendant articulates a legitimate, non-

discriminatory reason for its adverse employment decision, the presumption that the employee was fired for discriminatory reasons no longer applies.  *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000) (citations omitted).  "An employer sustains its burden by producing any evidence of nondiscriminatory reasons, whether ultimately persuasive or not. The employer need not prove by a preponderance of the evidence that the reasons for his actions were not discriminatory, but may simply 'present clear and specific reasons for the action.'"  *Monte v. Ernst & Young LLP*, 330 F. Supp. 2d 350, 361 (S.D.N.Y. 2004), *aff'd*, 148 F. App'x 43 (2d Cir. 2005) (citations, quotations marks and emphasis omitted).

"[T]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated . . . remains at all times with the plaintiff."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (citation omitted).  Therefore, after an employer provides a nondiscriminatory reason for an adverse employment decision, summary judgment shall be granted in favor of the employer unless the plaintiff can demonstrate that the nondiscriminatory reason for the employment decision was pretextual.  *See Varno v. Canfield*, 664 F. App'x 63, 65 (2d Cir. 2016), *cert. denied*, 138 S. Ct. 88 (2017) (citing *James*, 233 F.3d at 154).  "A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason [for the adverse employment decision]."  330 F. Supp. 2d at

362 (quotations omitted, emphasis omitted) (citing *St. Mary's Honor Ctr.*, 509 U.S. at 515).

### F. PLAINTIFF HAS FAILED TO ESTABLISH A *PRIMA FACIE* CASE THAT HE WAS "REGARDED AS" DISABLED DISCRIMINATION

With respect to the first factor necessary to establish a *prima facie* case, the parties do not dispute that defendant, LMC, is an institution subject to the ADA.  Plaintiff, however, fails to establish the remaining three steps necessary to establish his *prima facie* case.  With respect to the second factor, although plaintiff claims that he was regarded as disabled, he fails to present sufficient evidence in support of his "regarded as" claim.  Further, plaintiff cannot satisfy the third factor by establishing that he was qualified to perform the basic requirements of the position, given the numerous evaluations submitted by his supervisors evincing a concern that not only was plaintiff unqualified to carry out his duties, but that his lack of knowledge coupled with a lack of self-awareness posed a threat to patient welfare.  Nor has plaintiff established the fourth factor, that he suffered an adverse employment outcome because he was regarded as disabled, due to the overwhelming evidence of plaintiff's substandard performance that led defendant to terminate plaintiff for reasons unrelated to any perceived disability.  "If Plaintiff fails to make out any of these [prongs], the case must be dismissed." *Mitchell v. N.*

*Westchester Hosp.,* 171 F. Supp. 2d 274, 278 (S.D.N.Y. 2001). As discussed below, Plaintiff fails to satisfy three of the four prongs.

> **(1)** <u>Plaintiff Cannot Establish That He Was Regarded as Disabled.</u>

Plaintiff alleges that he was terminated by LMC because he was "regarded as" disabled. The ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Francis v. City of Meriden*, 129 F.3d 281, 283 (2d Cir. 1997)(citing 42 U.S.C. § 12112(a)). Disability is defined as, "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) *being regarded as having such an impairment.*" *Id.* (citing 42 U.S.C. § 12102(1)(c))(emphasis added).

> "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."

42 U.S.C.A. § 12102(3)(a); *see also Hilton v. Wright*, 673 F.3d

120, 129 (2d Cir. 2012)("[I]t is clear that he was only required to raise a genuine issue of material fact about whether Dr. Wright and/or DOCS regarded him as having a mental or physical impairment.").

The question of whether a plaintiff is "regarded as" having a disability turns on the perception of the employer. *Francis,* 129 F.3d at 284. "[T]he plaintiff must allege that the employer believed, however erroneously, that the plaintiff suffered from an 'impairment' that, if it truly existed, would be covered under the statutes and that the employer discriminated against the plaintiff on that basis." *Id.* at 285. The mere fact that a plaintiff possessed a quality that disqualified them from an activity, does not mean that their employer viewed the quality as a disability. *See id.* At 284-85. The *Francis* court noted that in *Daley v. Koch*, the court cautioned that the "regarded as" provision should focus on individuals who are truly disabled, and should not be broadened to the point that it dilutes the ADA's purpose of protecting disabled individuals from discrimination. *Id*. The *Francis* court explained, "In *Daley,* we rejected the plaintiff's contention that 'poor judgment, irresponsible behavior and poor impulse control,' the grounds stated by the defendant for not hiring the plaintiff, constituted a mental impairment within the meaning of the act." *Id*. at 285 (citing *Daley v. Koch,* 892 F.2d 212, 215 (2d

Cir. 1989); *see Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 73 (2d Cir. 1999).

Defendant failed to adduce sufficient facts to show that LMC regarded him as disabled. Plaintiff points to stray comments by Dr. Marecheau about plaintiff being "crazy" and a comment by Dr. Fitzpatrick that plaintiff needed to be diagnosed as proof that LMC had an "erroneous view of [plaintiff's] mental health" and asserts that Dr. Marecheau's comments reflected the hospital's "widespread [view]" that plaintiff was "crazy" or "weird." (Pl. MOL at 21(citing JA(2)-034; Def. Ex. A-23 ); Menken Decl., Ex. 18.) The cited comments are insufficient to show that LMC regarded plaintiff as disabled.

Dr. Marecheau testified that she was informed by LICH that something might be wrong with plaintiff, which could include "anything from some type of deficit to some type of learning disability . . . I'll put crazy in quotes, you know somethings not right," (JA(7)-013-014), and confirmed that she thought it was possible that plaintiff was "crazy . . .in quotes." (*Id.* at 039.) However, Dr. Marecheau testified that she did not use the term "crazy" when discussing Dr. Stolpner with others. (JA(7)-039. Plaintiff points to a text conversation where Dr. Marecheau appears to refer to plaintiff as "coocoo for cocoa puffs," but submits no evidence by which the court can ascertain that Dr. Marecheau's use

of the phrase refers to plaintiff as opposed to the "Frida" mentioned in the same text. (See Menken Decl. Ex. 18.) Plaintiff points to evidence that Dr. Marecheau did in fact share her perception of plaintiff with another attending Dr. Ilgan, after Dr. Ilgan complained about serious deficiencies in plaintiff's performance. (*See* JA(6)-013.) However, Dr. Ilgan testified that although there were rumors that plaintiff "had some mental health issues . . . no one gave me a diagnosis." (*Id*. at 012.) Plaintiff also alleges that Dr. Fitzpatrick's statement about getting plaintiff "diagnosed" shows that plaintiff was "regarded as" disabled. This statement at best reflects that Dr. Fitzpatrick referred plaintiff for an evaluation to found out if plaintiff suffered from a diagnosable disability, rather than a statement that Dr. Fitzpatrick regarded the plaintiff as suffering from a disability. Moreover, the statement by Dr. Fitzpatrick telling plaintiff that he was to be evaluated does not demonstrate that LMC regarded plaintiff as mentally disabled, even when considered alongside Dr. Marecheau's alleged comments.

Stray remarks alone are insufficient to defeat summary judgment, even when derogatory, where the commenter does not have ultimate authority to hire or fire an employee. *See Stephan v. W. Irondequoit Cent. Sch. Dist.*, 450 F. App'x 77, 80 (2d Cir. 2011) (citation omitted)(holding that a supervisor referring to a plaintiff using derogatory names such as "retard," "Special Edna,"

and "Crystal Meth," was insufficient to establish that the plaintiff's employer regarded the plaintiff as disabled because the supervisor lacked ultimate authority over hiring and firing the plaintiff); *see also Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 150 (2d Cir. 2010)*; *Martinez v. New York City Transit Auth.*, 672 F. App'x 68, 71 (2d Cir. 2016).  However, a stray remark that is an open declaration of bias, or a stray remark coupled with related actions, *see* 672 F. App'x at 71, or made in the context of an employment decision might suffice.  *See* 616 F.3d at 150.

In considering the test set forth in *Henry v. Wyet Pharm., Inc.*, the court finds that because Dr. Marecheau was not directly involved and did not exercise control over the CCC process resulting in plaintiff's dismissal.

Even if a reasonable juror might view the remarks as evidence of discriminatory intent by Dr. Marecheau and Dr. Fitzpatrick, the stray comments are insufficient to establish that LMC regarded plaintiff as disabled.  *See* 616 F.3d at 149 (holding that when considering whether comments are probative of discrimination, courts consider "(1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the

decision-making process).") (quotations omitted); *see also Davis v. Bombardier Transp. Holdings (USA) Inc.*, No. 11-CV-0782, 2013 WL 6816605, at *10 (E.D.N.Y. Dec. 24, 2013), *aff'd.* 794 F.3d 266 (2d Cir. 2015) (citing 450 F. App'x at 80) (noting "stray comments cannot form the basis for plaintiff's discrimination claim" where plaintiff claimed that after returning from disability leave she was told by one supervisor she would not be promoted due to her disability and another "when you are out, you are out"); *see also Monte*, 330 F. Supp. 2d at 363 (granting summary judgment in favor of employer and holding that "Plaintiff's evidence of stray comments and Scharks' [personal] biases would be insufficient, without more, to demonstrate that discrimination was a determinative factor in the decision."). Dr. Marecheau's limited comments to coworkers, outside the context of the decision-making process, are insufficient to show that the plaintiff's employer, LMC, engaged in "regarded as" discrimination, despite the fact that a reasonable juror could view the use of the terms "crazy" or "coocoo" in reference to plaintiff to reflect Dr. Marecheau's view that plaintiff suffered from a disability.

Plaintiff cites *Hansberry v. Father Flanagan's Boys' Home*, CV-03-3006(CPS), 2004 WL 3152393, at *6 n.11 (E.D.N.Y. Nov. 28, 2004), for the proposition that "[c]ourts have generally considered immediate supervisors who make recommendations to other supervisors or management about work actions such as terminations to be decision

makers." The *Hansberry* case is distinguishable from the instant case. Plaintiff conclusorily alleges that "LMC relied on [Dr.] Marecheau's discriminatory opinion of [Plaintiff] in its termination decision." (Pl. MOL at 17.) However, there is no evidence in the record that Dr. Marecheau's comment was known to the CCC committee or that Dr. Marecheau exercised influence in the CCC's decision to terminate plaintiff given the undisputed evidence that at least fourteen other physicians, nurses and medical staff during plaintiff's residency at LMC complained about plaintiff's job performance. Further, there is no record that Dr. Marecheau attended or otherwise exercised decision-making authority. When the CCC met on July 30, 2015 and unanimously voted to terminate plaintiff from LMC's residency program that meeting was attended only by the members of the CCC committee, Dr. Olivera, the Department Chair, Dr. Fitzpatrick, the Program Director, Dr. Kesavan the Associate Program Director, Dr. Faris, and three attendings, Dr. Aglialoro, Dr. Contreras, and Dr. Shahem as well as Guest attendees included L. McGuire, A egal and M. Garzon. (*see* Def. Exs. A-73 – A-74, A-76 – A-82). The CCC's unanimous decision was then sent for review by Human Resources (HR) and the Legal Department of LMC. (*See* Def. Ex. A-82 at LMC 192.)

Plaintiff also raises the "cat's paw" theory of liability. *Id*. Under the cat's paw theory, "a nondecisionmaker with a discriminatory motive dupes an innocent decisionmaker into taking

action against the plaintiff." *DeAngelo v. Yellowbook Inc.*, 105 F. Supp. 3d 166, 180 (D. Conn. 2015) (citing *Saviano v. Town of Westport*, 3:04-CV-522, 2011 WL 4561184, at *7 (D. Conn. Sept. 30, 2011). Even assuming, *arguendo*, that Dr. Marecheau was improperly motivated by discriminatory motive to critique plaintiff's performance there is no factual support from which a rational juror could find that she duped the actual decision-makers, the members of the CCC committee, or the numerous other medical professionals that submitted complaints during plaintiff's LMC residency, including a doctor from MSK, a hospital were Dr. Marecheau was not employed. Plaintiff's citation to *Petrone v. Hampton Bays Union Free Sch. Dist.*, 03-CV-4359, 2013 WL 3491057, at *21-22 (E.D.N.Y. July 10, 2013), *aff'd,* 568 F. App'x 5 (2d Cir. 2014) is similarly inapposite as the undisputed evidence in *Petrone* showed that a school superintendent who made stray remarks exercised considerable influence over hiring and firing decisions, despite not voting on the final decision. "[B]ecause McKenna was HBUFSD's Superintendent at the time he made the comments" and held a corresponding measure of control, "his comments may suffice to establish the employer's misconceptions [regarding the plaintiff's mental disability]." *Id.* at *22. Here, Dr. Marecheau is simply one of many attending physicians who supervised plaintiff's work and found it to be deficient.

Plaintiff alleges that LMC's decision to place plaintiff on

leave in October 2014, and to require plaintiff submit to a fitness for duty evaluation and subsequent mental health evaluation further support his argument that LMC regarded him as disabled.  Plaintiff provides no legal support for his position.  The Second Circuit has held that an employer's decision to require medical examinations to determine fitness for duty is insufficient to show that an employee is "regarded as" disabled.  *Colwell v. Suffolk Ctny. Police Dep't.*, 158 F.3d 635, 647 (2d Cir. 1998).  In the instant case, as in *Colwell*, the Second Circuit noted that, "The fact that the [employer] perceived a need to require the exams suggests no more than that their physical condition was an open question."  *Id.*; *see Kramer v. Hickey-Freeman, Inc.,* 142 F. Supp. 2d 555, 560 (S.D.N.Y. 2001)("the Court finds that to accept plaintiff's argument would "discourage [ ] employers from taking such preliminary or temporary steps [as placing an employee on medical leave] to keep their employees happy for fear that showing concern for an employee's alleged medical problems could draw them into court facing an ADA claim based on a perceived disability.").  The Seventh Circuit similarly analyzed an employer's referral of an employee for an evaluation in *Painter v. Ill. DOT,* 715 F. App'x 538, 541 (7th Cir. 2017), and found that requiring an employee who was the subject of multiple behavioral and performance complaints to undergo multiple mental examinations to determine fitness for duty was "consistent with business necessity."

        In the context of plaintiff's recent removal from clinical

service during his residency due to serious concerns about his deficient performance risking the safety and care of patients by attending and resident physicians, and persistent complaints about plaintiff's communication and interpersonal skills, as well as his resistance to criticism and inability to follow directions, Dr. Fitzpatrick's statement, "let's get you diagnosed," in reference to a planned evaluation does not, as plaintiff argues, demonstrate that plaintiff was regarded as mentally disabled. Rather the comment reflects Dr. Fitzpatrick's sound judgment in attempting to ascertain whether plaintiff was suffering from a disability that adversely affected his ability to perform as an OB/GYN resident. In fact, the evaluation assisted LMC in ruling out a disability as the source of plaintiff's professional shortcomings. Following plaintiff's required evaluation by a psychiatrist, Dr. Israelovitch, LMC was informed that, although the evaluation found a significant disparity between plaintiff's perception of his performance in the residency program and LMC's evaluation of plaintiff, plaintiff *did not meet the criteria for any psychiatric disorders* and was diagnosed only with an unspecified personality disorder. (*See* Def. 56.1 at ¶46 (citing Pl. Ex. 21-22)(emphasis added.) Plaintiff argues that the decision to require additional evaluation after Dr. Israelovitch allegedly "cleared him to return to work," demonstrates that LMC was unwilling to abandon a belief that plaintiff was disabled. (*See* Pl. MOL at 19). However, the record is replete with evidence that Dr. Israelovitch never

unequivocally cleared plaintiff to return to work or gave him a clean

bill of health, and that additional evaluation was warranted. (*See*

Def. 56.1 at ¶¶ 42-45; (JA(1)61-63.)

> **(2)** Defendants Have Shown That Plaintiff Was Not
> Qualified To Perform The Essential Functions Of The
> Job Of a Third Year (PGY-3) OB/GYN Resident.

Even assuming plaintiff was able to show he suffered from

a disability or was regarded as disabled, there is overwhelming

evidence in the record that plaintiff was not qualified for the

position of a PGY-3, a third-year OB/GYN resident.

> The ADA prohibits discrimination in employment against a
> qualified individual on the basis of disability. A
> qualified individual is defined as one who . . . can
> perform the essential functions of the employment position
> that such individual holds or desires . . . . [E]mployers
> may not discriminate against people with disabilities that
> do not prevent job performance, but when a disability
> renders a person unable to perform the essential functions
> of the job, that disability renders him or her
> unqualified.

*Stevens v. Rite Aid Corp.*, 851 F.3d 224, 228-29 (2d Cir.

2017), *cert. denied*, 138 S. Ct. 359 (2017) (internal quotation marks

excluded) (citing 42 U.S.C. § 12112(a) (2009); 42 U.S.C. §

12111(8)).

It is well established that the plaintiff in an ADA

discrimination case "bears the burden of proving he is 'otherwise

qualified' for his job." *LaBella v. New York City Admin. for*

*Children's Servs.*, No. 02-CV-2355, 2005 WL 2077192, at *17 (E.D.N.Y.

Mar. 28, 2005) (citing *Borkowski v. Valley Central School Dist.,* 63

F.3d 131, 138 (2d Cir. 1995)). Although a court will give

65

considerable deference to an employer's determination of what functions are essential to a job, the court must also consider relevant key factors such as the employer's judgment, written job descriptions and the amount of time spent performing each function. *See* 711 F.3d at 126 (citing *Stone v. City of Mt. Vernon,* 118 F.3d 92, 97 (2d Cir. 1997); 29 C.F.R. § 1630.2(n)(2))); *see also Silver v. Entergy Nuclear Operations, Inc.*, 290 F. Supp. 3d 234, 245 (S.D.N.Y. 2017) (quoting 711 F.3d at 126 ("[A] court will give considerable deference to an employer's determination as to what functions are essential.").  Once the essential functions are established, the court must then determine whether plaintiff has alleged sufficient facts to demonstrate that he met the requirements and that he could have performed the essential functions.  *Id*. at 127.  Plaintiff's performance is not measured by his own personal assessment of his abilities, but by his employer's specific criteria, which may be based on subjective business judgment.  *See Thornley v. Penton Pub., Inc.*, 104 F.3d 26, 29 (2d. Cir. 1997).

There is overwhelming evidence that plaintiff was unable to perform the essential functions of an OB/GYN PGY-3 resident at LMC.  The CCC committee unanimously voted to terminate plaintiff on July 30, 2015, based on plaintiff's performance which showed poor clinical judgment, inability to perform independent critical thinking and an inability to perform at his PGY level.  (Def. Ex. A-82 at LMC 192.)  The CCC noted that plaintiff's pattern of deficient

performance followed plaintiff through his internship, LICH residency and MSK. The CCC concluded that the "need to ensure that patients are not harmed by a doctor is of primary importance and the program must act to ensure that no patient is harmed . . . ." (*Id.*) At least fifteen physicians and five program directors at three hospitals commented in writing about plaintiff's lack of qualifications, including severely critical evaluations of plaintiff's inability to meet LMC's requirements. (*See e.g.* Def. 56.1 at ¶¶ 8-10 12, 21-29, 47, 89, 97, 100, 104.) In April 2014, plaintiff signed a PGY-3 Residency Agreement that listed his responsibilities as a physician in the OB/GYN department. (Def. Ex. A-10.) The agreement required, in part, that plaintiff, "participate in safe, effective compassionate patient care under supervision, commensurate with the Resident's level of advancement and responsibility," and, "accept the obligation to provide and maintain patient care as assigned on a continual basis and perform satisfactorily to the best of his/her ability the customs duties and responsibilities of the residency, including following the instructions and directives of the Department Chairperson and any other supervising physicians and senior residents." (*Id.*)

One of the recurring themes in plaintiff's many critical evaluations was that plaintiff was incapable of meeting the basic qualifications for residency at LMC, including following directions and providing safe and compassionate patient care. (*See e.g.* .JA(1)-

032-035, 037-041 (regarding plaintiff's dismissal from MSK).)  Doctors

at MSK had similar concerns.  On October 12, 2014, Dr. Carol Brown of

MSK submitted an evaluation stating:

> Dr. Stolpner seems not able to follow simple directions.  On
> multiple occasions he did the opposite of what was asked or
> completely ignored instructions.  He consistently wrote the
> wrong orders in patients, miscommunicated results and on one
> occasion where I had given specific instructions in a
> detailed email to the entire team not to ask a dying patient
> again about her decision re DNR [do not resuscitate] as she
> had requested to think about it overnight, [D]r. Stoplner
> went to the patient's room and tried to get her to decide
> about DNR . . . I was actually shocked that a resident would
> disobey a direct order like that.

(Def. Ex. A-20.)  On August 2, 2014, Dr. Joseph, an attending at LMC,

complained that plaintiff failed to timely transfer a patient a

hemorrhaging patient and sent another patient for a sonogram that [an

attending] explicitly instructed plaintiff against.  (See Def. Ex.

A-14.)  Given the substantively undisputed, voluminous and detailed

criticism and evaluations plaintiff received regarding his ongoing

inability to offer safe patient care, perform his duties

satisfactorily and follow instructions and directives of supervising

physicians and senior residents a reasonable juror could not find that

plaintiff was qualified for his position.

Plaintiff asks the court to disregard the extensive record

evidence of plaintiff's inability to meet the standards set by LMC

and other hospitals during his residency as irrelevant, "because LMC

accepted him into the Program, promoted him to PGY-3, and allowed

him to continue in the program throughout much of his PGY-3 despite

criticisms from his superiors." (Pl. MOL at 19.) Contrary to plaintiff's arguments, LMC's many documented attempts to provide plaintiff with constructive feedback, support and opportunities to improve cannot be fairly held against LMC. The court declines to conclude that because LMC accepted and promoted plaintiff from a second to a third year resident, plaintiff's myriad documented deficiencies including serious patient care concerns following plaintiff's advancement to PGY-3 cannot be considered in determining plaintiff's qualifications. Unlike the qualified plaintiff in *Heyman*, which plaintiff cites in support of his argument, there is voluminous undisputed evidence that plaintiff received consistent negative reviews throughout the course of his residency, including one deemed so serious that he was removed from his clinical duties during a rotation. *See Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 71 (2d Cir. 1999) ("[plaintiff] notes that he never had received a negative performance evaluation during his tenure at J-CAP."). Although some aspects of plaintiffs evaluations were positive, including one June 4, 2015 evaluation completed by Dr. Kesavan that ranked him as a five or higher on a scale of one to ten in multiple competencies, the positive evaluations often were submitted contemporaneously with negative evaluations. Dr. Kesavan's evaluation on June 4, 2015 was dated the same day the CCC met to discuss plaintiff's evaluation. (Def. 56.1 at ¶ 86-87.) The CCC

minutes of June 4th stated the following regarding plaintiff's performance:

> Dr. Stolpner is currently monitored by the committee for physician health and Dr. Kesavan acts as his CPH monitor. He has issues following direct orders and has trouble understanding. Concern from the committee is that the Lutheran environment is not good for him. Thus, he should be encouraged to take a job where he should be suitable for. But overall, he is definitely trying to improve. He has no issues with his logging and his evaluations are on track.

(Def. Ex. A-52). Plaintiff disagreed with the statement about difficulty following direct orders, but agreed with the statement about trying to improve. (*Id*. at ¶ 86-87 (citing (JA(1)-084 - JA(1)-085.) Taken as a whole, none of the comments regarding his improvement, often presented alongside negative feedback, raise a triable issue of fact as to whether plaintiff was qualified.

**(3)** Plaintiff Cannot Establish That He Suffered An Adverse Employment Action Because Of His Perceived Disability.

Plaintiff has not adduced sufficient facts to support his claim that he was terminated because he was regarded as disabled. The record is replete with years of negative evaluations, performance critiques and serious complaints that plaintiff endangered or narrowly avoided endangering the welfare of patients at LMC due to his poor knowledge base, inability to understand and apply constructive criticism, and failure to communicate with physicians, residents and hospital staff. Criticisms from fellow residents and attending physicians often were vividly framed as

grievous concerns for patient safety.

Assuming, *arguendo,* the plaintiff established he was qualified, "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the employer regarded the employee as disabled or that that perception caused the adverse employment action." 2005 WL 2077192, at *16 (citation omitted). Given plaintiff's history of complaints at LICH and the allegedly unprecedented removal of plaintiff from clinical duties during a clinical rotation at MSK, defendant's decision to have plaintiff undergo a mental evaluation to ascertain his fitness or duty was fully consistent with defendant's exercise of medical judgment. Defendant aptly notes, "When CPH concluded that [plaintiff] was, in their view, fit for duty, LMC **immediately** returned him to work. If he had been regarded as mentally impaired, he would not have so returned." (Def. Mem. at 29 (emphasis in original) (citing Def. 56.1 at ¶¶ 72-78).) Defendant's overwhelming evidence establishes that plaintiff was discharged, not due to a perception that plaintiff was mentally disabled, but because of plaintiff's repeated failures to exhibit "satisfactory job performance," including at the time of his termination. *See Thornley*, 104 F.3d at 29. Nor has plaintiff presented any evidence that defendant was motivated in part by discriminatory animus based on a disability or perceived disability.

71

Plaintiff speculates extensively, without evidentiary support, that everything that happened to him was based on unfounded perceptions that "there was something wrong" with him. Instead plaintiff merely offer his own opinion that various evaluations were wrong or biased, but presents no supporting evidence. *Id.* Plaintiff relies extensively on the fact that at various points in time he received positive evaluations in some areas, but the examples he provides often ignore significant contemporaneous negative criticism, a recurring theme in plaintiff's memorandum and in the plaintiff's responses to the multiple negative evaluations his colleagues submitted about him. Indeed, on August 19, 2014, an attending rated plaintiff as a "novice," and stated, "He needs help. He is not at all with his level of training; he is below his level of training in every aspect. My major concern with him is that I do not believe he is aware of how much of a deficit he functions at." (Def. Ex. A-15).

**(4)** Plaintiff Has Failed to Raise an Inference of Disparate Treatment

Plaintiff also argues that he was treated differently than other residents who received complaints, but were not perceived having mental disabilities. "A showing of disparate treatment 'is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case.'" *Raspardo v. Carlone*, 770 F.3d 97, 126 (2d Cir. 2014) (quoting *Ruiz v. Cnty. of Rockland*,

609 F.3d 486, 493 (2d Cir. 2010)). To successfully raise the inference, plaintiff must "show that the employer treated him or her "less favorably than a similarly situated employee" outside of the protected group." *Id.* (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). "A similarly situated employee is one similarly situated in all material respects to the plaintiff," and although the employees need not be identical, they "must have engaged in conduct of comparable seriousness." *Id.*

Courts in the Second Circuit regularly dismiss discrimination claims where the plaintiff failed to show that "the employer treated [him] less favorably than a similarly situated employee outside [his] protected group," and that he was "similarly situated in all material respects" to the individuals they compared themselves with to show disparate treatment. *Shumway v. United Parcel Serv., Inc.,* 118 F.3d 60, 64-65 (2d Cir. 1997) (affirming district court dismissal of Title VII claims due to insufficient factual allegations that plaintiff was similarly situated to her comparators) (citation omitted); *see generally Haggood v. Rubin & Rothman, LLC*, No. 14-CV-34L, 2014 WL 6473527, at *12 (E.D.N.Y. Nov. 17, 2014) (holding that plaintiff failed to present sufficient evidence to obtain an inference of discrimination based on a failure to demonstrate that the comparators were similarly situated in all material respects).

Although plaintiff argues that LMC successfully remediated

at least six similarly situated employees who were not disabled

following concerns regarding knowledge and behavior, (*See* Pl. MOL at

21-22), plaintiff provides woefully insufficient evidence to

establish that the residents were not disabled, or regarded as

disabled, and that they received similarly serious and multiple

ongoing complaints about their behavior, knowledge, and skill level.

(*See* Menken Decl., Ex. 21; JA(4)-026 – 028.)[9]

- **Comparator 1**

        The first comparator provided by plaintiff was a PGY-3

OB/GYN resident who was notified in March 2011 that deficiencies in

core competencies may prevent promotion to PGY-4.  Menken Decl., Ex.

21. D001257 – D001273.  The resident received negative criticism but

showed gradual improvement regarding knowledge, communication skills

and professionalism.  (*Id.*)  The critiques in the evaluation did not

involve acts or omissions that risked patient safety and health, and

wear not of comparable quantity nor seriousness of those faced by

plaintiff.  Further, there is no evidence to ascertain whether or

---

[9] Plaintiff cites to deposition testimony of Dr. Marecheau as evidence of a "different resident on a remediation plan." (*See* Pl. MOL at 26 (citing JA(7)-018 – JA(7)-021).) Nothing in the context of the deposition testimony establishes that the resident described therein is not one of the residents subject to a remediation plan in Menken Decl., Ex. 21. Further, the testimony does not support plaintiff's argument that the resident's performance deficiencies were "practically identical" to plaintiff's deficiencies. (*Id.*) The resident was described by Dr. Marecheau as having issues with disappearing, multi-tasking, assigning inappropriate tasks to other residents and subpar CREOG scores. JA(7)-018.) This evidence does not establish that the complaints were of comparable quantity or seriousness to those faced by plaintiff, who was the subject of numerous complaints about his patient care skills and his repeated disobedience of direct orders among other serious complaints involving patient safety. Further, Dr. Marecheau's testimony that she could not think of whether the resident was disabled or not is insufficient to show whether the resident was disabled or whether LMC regarded the resident as disabled. (*See* JA(7)-022.)

not the resident was disabled or regarded as disabled.  (*Id.*)

- **Comparator 2**

The second comparator was a PGY-3 with documented academic deficiencies who was placed on an extended academic remediation plan, due, at least in part, to his failure to perform satisfactorily on chapter reviews and tests.  (*Id.* at D001276 – D0001278.)  As with the first comparator, there was no evidence of whether or not the resident was disabled or perceived as such, nor was there evidence presented that this resident faced comparable complaints of similar volume or seriousness as plaintiff.  (*Id.*)

- **Comparator 3**

The third comparator was a PGY-2 resident who was placed on a four-month formal remediation plan due to issues with interpersonal skills, communication and patient care. (*Id.* at D001279 – D001282.)  This third comparator was terminated.  (*See Id.* at 11287.)  Again, there was no evidence from which the court could ascertain whether the third comparator was disabled or regarded as such, or received a similar volume of serious complaints.

- **Comparator 4**

Plaintiff alleges that the fourth comparator was a PGY-2 resident who received a formal remediation plan for problems with interpersonal skills and professionalism.  (*Id.* at D001288 – D001290.) She received a written remediation plan to address her interpersonal and communications skills after LMC received verbal

complaints about her vulgar and obscene language directed at medical students, including bringing two medical students to tears. (*Id.*; *see also* JA(4)-027, 029-031.)  Dr. Kesavan testified that she did not believe the female resident suffered from any kind of disability, but the resident was still referred to a doctor.  (*Id.* at 028.)  Plaintiff failed to submit sufficient evidence showing qualitative and quantitative similarities in plaintiff's and comparator four's deficiencies.

During the deposition of Dr. Kesavan, she also described a remediation plan for a resident following a cesarean section that "may not have needed to happen."  (JA(4)-031.)  Plaintiff argues that the resident referred to by Dr. Kesavan was Comparator 4 and that the remediation stemmed from a fetal demise.  However, the only evidence in the record plaintiff cites to support that conjecture is a single page from Dr. Kesavan's deposition in which she testified that it appeared that the twins had already demised prior to a cesarean section in which the resident may have been involved, that the C-section "may not have needed to happen," and that it was always the attending physician's decision whether to go to the operating room.[10] (JA(4)-031.)

---

[10] The evidence cited in JA(4)-031 regarding the resident associated with a fetal demise does not appear to definitively relate to the same individual  as cited in Plaintiff Exhibit 21.  The pages in the Joint Appendix cited to by plaintiff are not contiguous.  Page JA(4)-030 is page 88 of the deposition transcript of Dr. Kesavam, while JA(4-)-031 is page 95 of the deposition transcript.  Page JA(4-)-031 does not reference the resident by name or refer to any of the previous interpersonal problems cited for Comparator 4.

- **Comparator 5**

     Comparator five was a resident placed on academic probation. (Menken Decl., Ex. 21. at D001293.) Plaintiff fails to present any evidence regarding whether the comparator had a disability or was regarded as disabled.

- **Comparator 6**

     With regards to comparator six, a PGY-3, plaintiff submitted evidence that LMC implemented a formal remediation plan after multiple verbal and written complaints about the resident's issues with interpersonal skill and professionalism, including an inability to accept constructive criticism and follow instructions. (*Id*. at D0001296-1304.) As part of the terms of the remediation plan, the resident agreed to attend professional counseling sessions. (*Id*. at D001302.) Although there is evidence of remediation, plaintiff fails to submit evidence to establish whether or how comparator six was otherwise similarly situated to plaintiff.

     As plaintiff has "failed to identify a sufficiently similar comparator to establish as a matter of law that [he] was disparately treated," his claim of disparate treatment fails. *See* 770 F.3d at 126-128.

### G. LMC HAS ARTICULATED LEGITIMATE NON-DISCRIMINATORY REASONS FOR THE TERMINATION OF PLAINTIFF'S RESIDENCY

     Even assuming, *arguendo,* Plaintiff had established a *prima facie* case of disability discrimination, defendant, as detailed extensively above, has proffered a legitimate non-discriminatory

reasons for plaintiff's termination.  Defendant has thus rebutted the presumption that plaintiff suffered an adverse employment decision due to discrimination.  *See James*, 233 F.3d 149, 154 (2d Cir. 2000) (citations omitted); *see also Griffin v. Ambika Corp.,* 103 F. Supp. 2d 297, 302 (S.D.N.Y. 2000).  Defendant submitted voluminous detailed and undisputed evidence that plaintiff was terminated for poor performance.

It is well established in the Second Circuit that the termination of an employee due to substandard performance is a legitimate nondiscriminatory reason for termination.  *See generally Kloupte v. MISYS Int'l Banking Sys.*, 251 F. App'x 59, 60 (2d Cir. 2007) (granting summary judgment and holding that even if plaintiff made out a *prima facie* case of discrimination, plaintiff's failure to offer evidence indicating that employer's proffer of poor performance as a legitimate reason for dismissal was pretextual); *see also Pikoris v. Mount Sinai Med. Ctr.*, No. 96-CV-1403, 2000 WL 702987, at *14-16 (S.D.N.Y. May 30, 2000) (citing *Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir. 1985) (holding that medical resident's negative performance evaluations were a valid non-discriminatory reason for termination even where some reviews were positive and reflected good clinical skills and a willingness to learn).  "Absent discrimination, an employer may fire an employee for a good reason, bad reason, a reason based on erroneous facts, or no reason at all, so long as its action is not

based on a discriminatory reason." *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 290 (S.D.N.Y. 1999), *aff'd,* 205 F.3d 1327 (2d Cir. 2000) (citing *Mohamed v. Marriott Int'l Inc.*, 905 F.Supp. 141, 155 (S.D.N.Y. 1995) (granting summary judgment and holding that plaintiff failed to establish a prima facie case of discrimination based on disability or sexual orientation where plaintiff failed to present sufficient evidence that he was qualified for the position his employer terminated him from where he engaged in misconduct and violated a workplace policy). Based on the parties' submissions, the court declines to disturb defendant LMC's exercise of its medical judgment in terminating plaintiff from the OB/GYN residency program.

**H. PLAINTIFF CANNOT ESTABLISH THAT THE REASONS PROFFERED BY LMC FOR TERMINATING HIS EMPLOYMENT ARE A PRETEXT FOR UNLAWFUL DISCRIMINATION**

Where an employer offers a legitimate reason for an adverse employment decision, the plaintiff bears the burden of showing that the stated reason is pretextual.

> [I]n order to demonstrate the pretext necessary to survive a motion for summary judgment on his . . . claim. . . Plaintiff must make a substantial showing that [the employer's] explanation was false. The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action].")

*Obabueki v. Int'l Bus. Machines Corp.*, 145 F. Supp. 2d 371, 386 (S.D.N.Y. 2001), *aff'd*, 319 F.3d 87 (2d Cir. 2003) (citations and

internal quotation marks and parentheses omitted); *see Cruz v. Coach Stores, Inc.,* 202 F.3d 560, 567 (2d Cir. 2000), *remanded to* 202 F.3d 560 (2nd Cir. 2000). The Second Circuit has established that a plaintiff's unsupported allegations that an employer's stated legitimate reasons for a dismissal were pretextual are insufficient to raise a material question of disputed fact. *See id.*

Although plaintiff and defendant dispute whether a "but for" or "mixed motive" legal analysis standard applies to the instant case, plaintiff's claim fails under either analysis. Under a "but for" analysis, recently and clearly stated in *Forrester v. Prison Health Servs.*, 651 Fed. Appx. 27, 28 (2d Cir. 2016), a plaintiff must show that the defendant, LMC, would not have terminated plaintiff but for the fact that it regarded plaintiff as disabled. Plaintiff seeks the application of a mixed-motive standard, wherein a party must show that discrimination was a motivating factor in a decision to terminate an employee. *See Parker v. Columbia Pictures Indus.,* 204 F.3d 326, 337 (2d Cir. 2000).

Given the abundant non-discriminatory reasons provided by defendant and supported in the record to terminate plaintiff's residency, plaintiff cannot possibly establish that he would not have been dismissed "but for" his disability. Under the mixed motive analysis established in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258 (1989), "to warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke'

to support his allegations of discriminatory treatment." *Sista*, 445
F.3d at 74 (citation omitted). Such evidence would include "policy
documents and evidence of statements or actions by decisionmakers that
may be viewed as *directly reflecting* the alleged
discriminatory attitude." *Id.* at 173 (emphasis in original).
Plaintiff does not make such a showing, and instead proffers
suppositions and inferences based on stray comments, LMC's efforts to
seek help for plaintiff through a psychiatric evaluation and
counseling, and unsupported allegations of disparate treatment.

Plaintiff's opinion that LMC may have been able to offer
plaintiff additional tools to overcome his deficiencies in performance
does not compel the conclusion that LMC was required to do so. *See
Silver*, 290 F. Supp. 3d at 249 ("While a reevaluation, referral, or
different categorization might have been compassionate, an employer—
particularly one in a highly sensitive and regulated industry–has no
obligation to be compassionate, and its failure to be so is not
evidence of pretext."). As plaintiff has failed to "proffer[ ]
evidence sufficient to allow a rational fact-finder to conclude that
Defendant's stated reasons for Plaintiff's termination were false" or
"introduce evidence sufficient to support a rational inference that
discrimination was a 'determinative factor' in the decision to
terminate his employment," the court grants defendant's Motion for
Summary Judgment as to plaintiff's ADA claims and plaintiff's ADA

claims are dismissed with prejudice. *Monte*, 330 F. Supp. 2d at 362–
63.

### I.   PLAINTIFF'S STATE LAW CLAIMS

Plaintiff also alleged that defendant, LMC, violated New
York State Human Rights Law, Executive Law §§ 290 et seq. ("NYSHRL").
"The same substantive standards apply to claims of employment
discrimination under Title VII, § 1981, and the NYSHRL." *Joseph v.
Marco Polo Network, Inc*., No. 09-CV-1597, 2010 WL 4513298, at *7
(S.D.N.Y. Nov. 10, 2010)(*citing Vivenzio v. City of Syracuse*, 611 F.3d
98, 106 (2d Cir. 2010)). As plaintiff's claims under NYSHRL are
analyzed using the same substantive standards as those brought
pursuant to the ADA, the analysis is coextensive. Accordingly the
court grants defendant's Motion for Summary Judgment as to plaintiff's
NYSHRL claims for the same reasons as stated above that the court
granted defendant's summary judgment motion on plaintiff's ADA claims.
The NYSHRL claims are dismissed with prejudice.

### J.   THE COURT DECLINES TO EXERCISE SUPPLEMENTAL JURISDICTION OVER PLAINTIFF'S NEW YORK CITY CLAIMS

Plaintiff also alleged that defendant, LMC, violated the New
York City Human Rights Law, Admin. Code § 8-101 et seq. ("NYCHRL").
As the court has dismissed the only federal cause of action raised in
plaintiff's complaint and the coextensive state law claim, the court
exercises its discretion to decline to exercise supplemental
jurisdiction pursuant to 28 U.S.C. § 1367(c)(3). It is established in

the Second Circuit that where all federal-law claims are eliminated before trial, "the balance of factors to be considered under the [supplemental] jurisdiction doctrine--judicial economy, convenience, fairness, and comity--will point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia ex rel. Franco v. Lee,* 316 F.3d 299, 305 (2d Cir. 2003) (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n.7 (1988)); *accord Silver*, 290 F. Supp. 3d at 250. As plaintiff's ADA claim is dismissed, the court declines to exercise supplemental jurisdiction over plaintiff's NYCHRL claims. Plaintiff's NYCHRL claims are dismissed without prejudice.

### III. CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment is granted. The Clerk of the Court is respectfully requested to enter judgment in favor of defendant and close this case.

**SO ORDERED.**

Dated:  September 29, 2018
        Brooklyn, New York

                                    _____/s/_____
                                    Kiyo A. Matsumoto
                                    United States District Judge